**Case Nos. 19-55241 (L), 19-55242**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

JOYCE WALKER, KIM BRUCE HOWLETT, MURIEL SPOONER, TALINE BEDELIAN
and OSCAR GUEVARA, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellees,*

v.

LIFE INSURANCE COMPANY OF THE SOUTHWEST, a Texas corporation,

*Defendant-Appellant.*

_____

*Appeals from July 31, 2018 Order Granting Certification of a Class Action and October 22, 2018 Order
Denying Plaintiffs' Motion for Reconsideration, entered by the United States District Court for the
Central District of California, Case No. 2:10-cv-09198-JVS (RNBx) before the Honorable James V. Selna*

## SECOND BRIEF ON CROSS-APPEAL

LYN R. AGRE (SBN 178218)
MARGARET A. ZIEMIANEK (SBN 233418)
VERONICA NAUTS (SBN 300558)
KASOWITZ BENSON TORRES LLP
101 California Street, Suite 2300
San Francisco, California 94111
(415) 421-6140 Telephone
(415) 398-5030 Facsimile
lagre@kasowitz.com
mziemianek@kasowitz.com
vnauts@kasowitz.com

BRIAN P. BROSNAHAN (SBN 112894)
CORNERSTONE LAW GROUP
351 California Street, Suite 600
San Francisco, California 94104
(415) 974-1900 Telephone
(415) 974-6433 Facsimile
bbrosnahan@cornerlaw.com

*Attorneys for Plaintiffs-Appellees Joyce Walker, Kim Bruce Howlett,
Muriel Spooner, Taline Bedelian and Oscar Guevara*

July 8, 2019

 COUNSEL PRESS · (213) 680-2300

PRINTED ON RECYCLED PAPER 

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................1

    A.   Plaintiffs' Appeal ....................................................................1

    B.   LSW's Appeal ........................................................................4

II.  JURISDICTIONAL STATEMENT ....................................................7

III. STATEMENT OF THE ISSUES ........................................................7

IV.  STANDARD OF REVIEW .................................................................8

V.   COUNTER STATEMENT OF THE CASE ........................................9

    A.   Factual Background...................................................................9

        1.   The Policies and Policy Illustrations .........................9

        2.   The Claims At Issue...................................................13

        3.   LSW's Irrelevant or Misleading Factual Statements................15

            a.   Facts Concerning The Policies ........................15

            b.   Facts Concerning Plaintiffs and Plaintiffs' Claims ........15

    B.   Procedural History Relevant to This Appeal .......................18

        1.   The Class Certification Motion..................................18

        2.   The Motion For Reconsideration Of The Class Certification Order ................................................20

        3.   The Petition For Permission To Appeal Order Granting Plaintiffs' Motion For Class Certification And Order Denying Plaintiffs' Motion For Reconsideration ....................................23

VI.  SUMMARY OF THE ARGUMENT ................................................24

    A.   Plaintiffs' Appeal ...................................................................24

B.    LSW's Appeal ..................................................................26

VII.  ARGUMENT.....................................................................28

A.    PLAINTIFFS' APPEAL SHOULD BE GRANTED, THUS INCLUDING ALL PURCHASERS IN THE CLASS REGARDLESS OF WHEN THEY RECEIVED THEIR ILLUSTRATIONS .............28

1.    Plaintiffs' Petition Is Procedurally Proper ................................28

2.    The District Court Committed An Error Of Law In Finding That Consumers Who Received Illustrations Only At The Time of Policy Delivery Could Not Satisfy The Reliance Element Of The UCL And Therefore Could Not Be Members Of The Plaintiff Class. .........................................................................37

a.    The Reliance Requirement Of The UCL ........................37

b.    The District Court's Flawed Reliance Analysis .............38

(i)    The district court ignored contract law principles in finding that a life insurance policy is binding on a consumer upon delivery irrespective of the consumer's acceptance of the policy...................38

(ii)    The district court ignored the requirements of, and policies underlying, the Illustration and Free Look Statutes ................................................................42

B.    LSW'S APPEAL SHOULD BE REJECTED....................................46

1.    If The Court Grants Plaintiffs' Appeal, LSW's Appeal Should Be Rejected As Moot .................................................................46

2.    If The Court Denies Plaintiffs' Appeal, The Court Should Deny LSW's Appeal On the Merits Because The District Court Did Not Abuse Its Discretion In Certifying A Class Of Purchasers Who Received An Illustration On Or Before The Date Of Policy Application....................................................................46

a.    The Teachings of *Briseno* ...............................................47

b. The District Court Did Not Abuse Its Discretion In Applying *Briseno* ......................................................51

c. LSW Cites No Authority That Conflicts With the District Court's Application of *Briseno* ...................57

d. Plaintiffs Have Not Created A "Fail Safe Class," Or Otherwise Defined the Class Improperly To Avoid Predominance Inquiry, Because Membership In The Class Turns On A Simple Objective Fact......................61

e. The Need For Individualized Determinations Of Class Membership Does Not Defeat Predominance ...............64

VIII. CONCLUSION...................................................................66

CERTIFICATE OF COMPLIANCE.......................................................67

STATEMENT OF RELATED CASES ...................................................68

ADDENDUM OF STATUTES AND RULES.................................... A-1

CERTIFICATE OF SERVICE

iii

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
  731 F.3d 952 (9th Cir. 2013) ........................................................................8, 9

*Amchem Products, Incl. v. Windsor*,
  521 U.S. 591 (1997)........................................................................................54

*Blair v. Equifax Check Servs., Inc.*,
  181 F.3d 832 (7th Cir. 1999) ........................................................................33

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ................................................................*passim*

*Brooks v. Darling Int'l, Inc.*,
  2017 U.S. Dist. LEXIS 49660 (E.D. Cal. Mar. 30, 2017).................................60

*Brown v. DirecTV, LLC*,
  330 F.R.D. 260 (C.D. Cal. 2019).......................................................................63

*Chamberlan v. Ford Motor Co.*,
  402 F.3d 952 (9th Cir. 2005) ...........................................................................34

*In re ConAgra Foods, Inc.*,
  90 F. Supp. 3d 919 (C.D. Cal. 2015) ................................................................47

*Des Isles v Evans*,
  225 F.2d 235 (5th Cir. 1955) ...........................................................................37

*EQT Prod. Co. v. Adair*,
  764 F.3d 347 (4th Cir. 2014) .....................................................................56, 57

*Gary v. Sheahan*,
  188 F.3d 891 (7th Cir. 1999) ...........................................................................33

*Hall v. North Am. Van Lines, Inc.*,
  476 F.3d 683 (9th Cir. 2007) ......................................................................9, 65

*Herrera v. LCS Fin. Servs. Corp.*,
  274 F.R.D. 666 (N.D. Cal. 2011).......................................................................64

*Hilsley v. Ocean Spray Cranberries, Inc.*,
2018 U.S. Dist. LEXIS 202679 (S.D. Cal. Nov. 29, 2018) ................................60

*Immigrant Assistance Project of Los Angeles Cnty. Fed'n of Labor
(AFL-CIO) v. I.N.S.*, 306 F.3d 842 (9th Cir. 2002) ................................9

*J.L. v. Cissna*,
2019 U.S. Dist. LEXIS 16761 (N.D. Cal. Feb. 1, 2019) ....................................60

*Kamar v. RadioShack Corp.*,
375 Fed. App'x. 734 (9th Cir. 2010) ....................................62

*Lambert v. Nutraceutical Corp.*,
870 F.3d 1170 (9th Cir. 2017), *rev'd*,
586 U.S. __, 139 S. Ct. 710 (2019)............................................29, 30

*Mazza v. Am. Honda Motor Co., Inc.*,
666 F.3d 581 (9th Cir. 2012) ..........................................37, 38, 49, 55

*Melgar v. CSK Auto, Inc.*,
681 Fed. App'x. 605 (2017)....................................62, 63

*Ms. L. v. U.S. Immigration & Customs Ent't*,
330 F.R.D. 284 (S.D.Cal. Mar. 8, 2019) ........................................65, 66

*Mullins v. Direct Dig., LLC*,
795 F.3d 654 (7th Cir. 2015) ....................................48, 49

*Myers v. Commissioner of Internal Revenue Service*,
____F.3d ____ (D.C. Circuit, July 2, 2019), 2019 WL 2750850................36, 37

*Nucor Corp. v. Brown*,
760 F.3d 341 (4th Cir. 2014) ..............................................33

*Nutraceutical Corp. v. Lambert*,
586 U.S. __, 139 S. Ct. 710 (2019)............................................*passim*

*Panacci v. A1 Solar Power, Inc.*,
2015 WL 3750112 ..................................................63

*In re Petrobras Securities*,
862 F.3d 250 (2d Cir. 2017) ....................................52, 57, 58

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ..............................................................53

*Racies v. Quincy Bioscience, LLC*,
    2017 U.S. Dist. LEXIS 206807 (N.D. Cal. Dec. 15, 2017)...............49

*Rikos v. Procter & Gamble Co.*,
    799 F.3d 497 (6th Cir. 2015), *cert. denied*, 136 S.Ct. 1493 (2016) ..................59

*Sali v. Corona Reg'l Med. Ctr.*,
    909 F.3d 996 (9th Cir. 2018) ...............................................................8

*Sandusky Wellness Center, L.L.C. v. ASD Specialty Healthcare, Inc.*,
    863 F.3d 460 (6th Cir. 2017) .............................................................59

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
    821 F.3d 992 (8th Cir. 2016) .............................................................59

*Shin v. Cobb Cnty. Bd. of Educ.*,
    248 F.3d 1061 (11th Cir. 2011) ....................................................33, 34

*Smith v. James Irvine Found.*,
    402 F.2d 772 (9th Cir. 1968) ...............................................................9

*Smith v. Univ. of Washington, Law Sch.*,
    233 F.3d 1188 (9th Cir. 2000) ...........................................................32

*Torres v. Mercer Canyons, Inc.*,
    835 F.3d 1125 (9th Cir. 2016) .....................................................49, 62

*True Health Chiropractic, Inc. v. McKesson Corp.*,
    896 F.3d 923 (9th Cir. 2018) ......................................................58, 59

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. ___, 136 S. Ct. 1036 (2016)..........................................54, 55

*United States v. Hinkson*,
    585 F.3d 1247 (9th Cir. 2009) .............................................................9

*United States v. Ibarra*,
    502 U.S. 1 (1991) (*per curiam*) ........................................................30

*Victorino v. FCA US LLC*,
   326 F.R.D. 282 (S.D. Cal. June 13, 2018).........................................................60

*Yokoyama v. Midland Nat. Life Ins. Co.*,
   594 F.3d 1087 (9th Cir. 2010) ...............................................................8, 37, 53

*Young v. Nationwide Mutual Ins. Co.*,
   693 F.3d 532 (6th Cir. 2012) ...............................................................................66

**State Cases**

*Aetna Casualty & Surety Co. v. Richmond*,
   76 Cal. App. 3d 645 (1977) .................................................................................41

*City of Moorpark v. Moorpark Unified Sch. Dist.*,
   54 Cal. 3d 921 (1991) ...........................................................................................39

*Donovan v. RRL Corp.*,
   26 Cal. 4th 261 (2001) ..........................................................................................39

*Hackethal v. Nat'l Cas. Co.*,
   189 Cal. App. 3d 1102 (1987) ..............................................................................41

*Rosenthal v. Great Western Fin. Secs. Corp.*,
   14 Cal. 4th 394 (1996) ..........................................................................................41

*Schlessinger v. Holland Am., N.V.*,
   120 Cal. App. 4th 552 (2004) ..............................................................................41

*In re Tobacco II Cases*,
   48 Cal. 4th 298 (2009) ...................................................................................45, 55

**Statutes**

28 U.S.C. §1291 ..........................................................................................................7

28 U.S.C. §1332(D)(2)(A) ..........................................................................................7

Cal. Bus. & Prof. Code §17204 ...............................................................................37

Cal. Ins. Code §10127.9.................................................................................*passim*

Cal. Ins. Code §10127.9(a)(1)..................................................................................44

Cal. Ins. Code §10509.950.................................................................10, 43

Cal. Ins. Code §§ 10509.950-10509.965 .............................................1, 10

Cal. Ins. Code §10509.953(h)(1) ...............................................................1

Cal. Ins. Code §10509.958.................................................................*passim*

Cal. Ins. Code §10509.958(a)(1).................................................................43

Cal. Ins. Code §10509.958(a)(2)..........................................................12, 43

Cal. Ins. Code §10509.958(b) .....................................................................44

**Rules**

Federal Rule of Appellate Procedure 5 .......................................................7

Federal Rule of Civil Procedure 23(b)(2) ................................................32

Federal Rule of Civil Procedure 23(b)(3) ...........................................*passim*

Federal Rule of Civil Procedure 23(f) ................................................*passim*

Central District of California Local Rule 7-3 .........................................22

**Other Authorities**

7AA C. Wright, A. Miller, & M. Kane, Federal Practice
    and Procedure §1778 ...........................................................................55

I.     INTRODUCTION

A.     Plaintiffs' Appeal

The appeal by Plaintiffs-Appellees ("Plaintiffs") concerns the rights of

consumers purchasing life insurance to review and rely on illustrations that are

provided to them at the time the policy is delivered in deciding whether to accept

the policy and whether to exercise the right to cancel the policy during the 10-day

"free look period" provided by California Insurance Code Section 10127.9 (the

"Free Look Statute").[1]

California's Illustration Statute (Cal. Ins. Code §§ 10509.950-10509.965)

requires that an illustration of the policy as issued be provided to the consumer no

later than the time of policy delivery. *Id*. at §10509.958. The disclosures in the

illustrations are substantively the same whether they are provided at the time of

application or at the time of policy delivery. The district court has already found

that all of the defendants' illustrations violated the Illustration Statute. Yet the

district court ruled that consumers who received illustrations at the time of policy

delivery (as opposed to the time of application) could not possibly have relied on

---

[1] The type of illustration at issue here, called a "basic illustration," is defined as "a ledger or proposal used in the sale of a life insurance policy that shows both guaranteed and nonguaranteed elements." Cal. Ins. Code §10509.953(h)(1). Unless otherwise noted, all references to illustrations refer to basic illustrations. Unless otherwise noted, all statutory references are to the California Insurance Code.

the illustrations and thus had to be excluded from a class action brought on behalf of all persons who purchased Provider or Paragon equity-indexed life insurance policies from Life Insurance Company of the Southwest, Inc. ("LSW") during the relevant period. *See* ER55-57.[2]

The district court arrived at its conclusion by finding that a purchase of life insurance is concluded the moment a policy is delivered to the prospective purchaser, thus leaving the consumer with no opportunity to review, let alone rely on, the illustration that Section 10509.958 guarantees will be provided "no later than the time the policy is delivered." The district court's exclusion of those purchasers who received illustrations only at the time of policy delivery from the class was clear legal error for three reasons.

First, the delivery of a life insurance policy is merely an offer that must still be accepted in order to bind the insured. The district court's order treats the policy like a summons, which is binding on the recipient as soon as it is received. But a summons is not a contract, and a life insurance policy is not like a summons. A policy of life insurance is not binding on a prospective purchaser until he or she

---

[2] The district court certified a class consisting of all California persons who purchased the relevant policies in the relevant period but added the following limiting clause: "and who received an illustration on or before the date of policy application." ER52, ER57.

accepts the policy. The district court erred in ignoring this basic requirement of contract law.

Second, the district court erred by ignoring the text of, and the policy underlying, Section 10509.958. That statute's guarantee that a prospective purchaser will receive an illustration no later than policy delivery would mean little if the purchase is concluded before the illustration can be reviewed.

Third, even if the district court were correct that the purchase is concluded at the moment of policy delivery (i.e., without any requirement of acceptance by the policyholder), policyholders who received illustrations at the time of policy delivery can still establish reliance because they received illustrations and then did not cancel their policies during the free look period. The Order Denying Reconsideration ignores the strong consumer protection policy underlying Section 10127.9, which is that consumers must be provided ample time to review and rely on illustrations and other disclosures in deciding whether they want to be bound to a life insurance policy. That policy consideration is the same regardless of whether one focuses on whether the consumer relied on the illustration in accepting the policy or in not cancelling the policy during the free look period.

In sum, policyholders who received illustrations only at the time of delivery should have been included in the class because 1) they each accepted their policy after they received an illegal illustration, and 2) they each declined to cancel their

3

policy during the free look period. Yet the district court inexplicably held that neither of these reasons was sufficient. The district court's order excluding these policyholders from the class was incorrect as a matter of law and should be reversed.

### B.    LSW's Appeal

If the Court sustains Plaintiffs' appeal, then it should reject the appeal by LSW as moot because there will be no need to determine when any particular purchaser received an illustration. Since LSW's appeal is premised on the need for individualized determinations of when each class member received an illustration, LSW's appeal fails if there is no need to make such determinations.

Alternatively, if the Court rejects Plaintiffs' appeal, it should reject LSW's appeal on the merits because LSW has failed to show that the district court abused its discretion in certifying a class of purchasers of LSW policies who received an illustration on or before the date of policy application.

*Briseno v. ConAgra Foods, Inc*., 844 F.3d 1121 (9th Cir. 2017), teaches that courts should not deny class certification due to manageability problems with identifying class members and that district courts can use claims administration procedures to determine individualized questions of class membership (just as they have long used such procedures to make individualized damages determinations).

4

*Id.* at 1128-31. The district court followed *Briseno* and certified a class of persons who received illustrations on or before the date they applied for their policies.

Unable to challenge the district court's finding that, in light of *Briseno*, the difficulties of identifying class members on an individual basis "are no longer valid justifications to find a lack of predominance," ER12, LSW mischaracterizes the district court's order and claims that the district court found that it was precluded from including class membership issues in a predominance analysis. Defendant-Appellant's Opening Brief ("AOB") at 2 & 24-26. But the district court made no such finding.

LSW attacks *Plaintiffs'* interpretation of *Briseno* as precluding consideration of class membership issues in predominance analysis, but these attacks miss the mark because the district court did not adopt Plaintiffs' interpretation. Instead, the district court appears to have adopted a narrower interpretation of *Briseno* that permits the court to consider class membership issues in predominance analysis and to consider, within that analysis, manageability and superiority considerations as well as the court's ability to devise appropriate claims administration procedures. LSW itself suggests that this interpretation of *Briseno* is correct, see AOB at 28, n.8, and at no point does LSW explain how *Briseno* could be read to deny class certification simply because of the effort that would be required to identify which purchasers of the relevant policies received illustrations on or

5

before the date of policy application. To the contrary, *Briseno* makes clear that this Circuit expects district courts to undertake such efforts. If *Briseno* is read to subject class membership issues to predominance analysis, then *Briseno*'s guidance regarding the treatment of class membership issues in the context of manageability and superiority analysis must also inform predominance analysis, or much of that guidance, discussed below at pages 47-50, would have little point.

Thus, while Plaintiffs believe that *Briseno* exempts class membership issues from predominance analysis for the reasons we discuss below at pages 49-50, this Court need not adopt that position in order to affirm the district court. The district court's order can and should be affirmed because the district court did not abuse its discretion in finding that the need for individualized class membership determinations did not defeat predominance. The district court found common questions regarding numerous issues, including violation of the Illustration Statute (which the court adjudicated against LSW on summary judgment), reliance, materiality, injury, restitution, rescission, and injunctive or declaratory relief. ER9, ER12-18. LSW does not challenge the commonality of these issues, which plainly predominate over any individual issues, as the district court properly found. Moreover, regardless of how the district court articulated its interpretation of *Briseno*, this Court may affirm on any basis supported by the record. LSW's appeal should therefore be denied.

## II.    JURISDICTIONAL STATEMENT

The district court has subject-matter jurisdiction under 28 U.S.C. §1332(D)(2)(A) because this is a putative class action with more than $5 million in controversy, class members are California residents, and LSW is incorporated and has its principal place of business in Texas.  This Court has appellate jurisdiction under Federal Rule of Civil Procedure 23(f), Federal Rule of Appellate Procedure 5, and 28 U.S.C. §1291.  Plaintiffs' Rule 23(f) Petition was timely filed on November 5, 2018, within 14 days of the district court's October 22, 2018 Order Denying Plaintiffs' Motion for Reconsideration.

## III.    STATEMENT OF THE ISSUES

Plaintiffs' appeal presents the following issue:  whether a life insurance purchaser is entitled to review and rely on a policy illustration in deciding whether to accept a life insurance policy and whether to exercise the right to cancel the policy during the free look period.

LSW states the issue presented by its appeal as "[w]hether the district court committed legal error by certifying a class of pre-application illustration recipients based on its view that *Briseno* precludes consideration of individualized issues concerning the timing of illustration receipt as part of predominance analysis." AOB at 4.  Because the district court expressed no such view, Plaintiffs believe the real issue presented by LSW's appeal to be whether the district court abused its

7

discretion in finding that the need to make individualized class membership determinations does not defeat predominance.

## IV. STANDARD OF REVIEW

Appellate courts review district court class certification orders for abuse of discretion. *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1002 (9th Cir. 2018). Where an appellant alleges that the district court premised a class certification determination on an error of law, the reviewing court must first evaluate whether legal error occurred under a de novo standard of review. *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010). If the appellate court determines that the district court's order was premised on a legal error, it will find a per se abuse of discretion. *Id.* If the appellate court finds that no legal error occurred, then it will review the district court's class certification decision for abuse of discretion. *Id.*

A district court abuses its discretion, in making a discretionary ruling, if "it (1) relies on an improper factor, (2) omits a substantial factor, or (3) commits a clear error of judgment in weighing the correct mix of factors." *Sali*, 909 F.3d at 1002 (quoting *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956 (9th Cir. 2013)). Additionally, appellate courts review a district court's findings of fact under the "clearly erroneous standard," meaning reviewing courts will reverse a district court's findings only if they are "(1) illogical, (2) implausible, or (3)

without 'support in inferences that may be drawn from the record.'" *Id.* (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009)). Moreover, "it is presumed on appeal that the district court's findings are correct," and the appellate court's "role is limited to that of determining whether appellant has rebutted this presumption of correctness by demonstrating that contrary findings are warranted when the evidence is taken as a whole and considered in a light most favorable to the appellees." *Smith v. James Irvine Found.*, 402 F.2d 772, 774 (9th Cir. 1968).

Finally, the Court may affirm a district court decision on any basis supported by the record. *See e.g., Hall v. North Am. Van Lines, Inc.*, 476 F.3d 683, 686 (9th Cir. 2007); *Immigrant Assistance Project of Los Angeles Cnty. Fed'n of Labor (AFL-CIO) v. I.N.S.*, 306 F.3d 842, 856 n.12 (9th Cir. 2002).

## V.  COUNTER STATEMENT OF THE CASE

### A.  Factual Background

#### 1.  The Policies and Policy Illustrations

LSW sells equity-indexed universal life insurance policies, including the SecurePlus Provider policy ("Provider"), and sold the SecurePlus Paragon policy ("Paragon") throughout California. The policies have a cash value that can earn interest credits based on the performance of the S&P 500 Index, though cash values are reduced by a variety of fees that LSW deducts from the cash value. If the S&P 500 posts gains in a given year, then the policy will earn interest credits that track the performance of the S&P 500, subject to a cap (e.g., 10%) and a floor

9

of 0%. ER426-430. As discussed below at pages 13-14, the policies also promise certain levels of guaranteed interest credits that will be earned even if the S&P 500 performs poorly.

LSW markets and sells its policies using policy Illustrations. Illustrations are disclosure documents that ***all*** life insurance consumers receive which provide a summary demonstrating how the policies operate under specified "what-if scenarios." ER439-440 (24:10-16). An exemplar Illustration is in the record at Supplemental Excerpts of Record ("SER") 101-24 (Walker, October 2006 Illustration).

Illustrations are heavily regulated by California's Illustration Statute (Ins. Code §§10509.950-10509.965). The Illustration Statute seeks to protect consumers to "ensure that illustrations do not mislead purchasers of life insurance and to make illustrations more understandable by providing illustration formats, prescribing standards to be followed when illustrations are used, and specifying the disclosures that are required in connection with illustrations." Cal. Ins. Code §10509.950. The Illustration Statute requires that ***every*** purchaser of a life insurance policy receive an illustration of the policy as issued, that the illustration be signed by the purchaser, and that the purchaser be given a copy of the signed illustration no later than the time of policy delivery. Cal. Ins. Code §10509.958.

While *illustrations* of issued policies must be signed by a prospective purchaser, *policies* do not need to be signed by purchasers.

Life insurance consumers may receive an illustration at various times in the purchasing process. The relevant disclosures in the illustrations are substantively the same regardless of when a consumer receives the illustration.[3] Some consumers receive illustrations at or before the time they apply for a life insurance policy. Other consumers do not receive an illustration at the time of policy application, but instead receive an illustration at the time the policy is delivered. ER443. Still other consumers receive an illustration (or more than one illustration) at or before the time of policy application and also receive an illustration at the time of policy delivery where the policy issued is different in some way from the policy that was originally illustrated.

For example, an applicant may receive an initial illustration that is processed for the applicant based on a Non-Tobacco risk classification. Later, during the underwriting process, the insurer may classify the applicant as being in a Tobacco risk classification. A new illustration will then be processed based on the new

---

[3] LSW points to differences that can exist in the content of pre-application illustrations as compared with illustrations received at the time of policy delivery. See AOB at 6-7. No such differences are relevant to this case, as LSW's violations of the Illustration Statute are the same in all of LSW's illustrations regardless of the time of delivery.

classification, a Tobacco risk classification, which will illustrate higher cost of insurance charges and lower policy values. As required by Section 10509.958(a)(2), a prospective purchaser must be provided with the revised illustration no later than the time of policy delivery.[4]

Once a policy is issued, LSW instructs its agents to deliver the policy in person to the applicant along with an illustration of the policy that LSW has actually issued (often called a "batch illustration") if the applicant has not previously received an illustration of the policy as issued. ER443 (28:11-18); SER82. Delivery of the batch illustration is not a mere formality. Regardless of whether the illustration is provided at or before the time of policy application, delivery, or between application and delivery, LSW trains its agents "to review any illustrations with the client, explain their contents, and answer any questions that the policyholder may have . . . ." ER444 (29:10-14).

---

[4] Three of the five named Plaintiffs were issued policies that placed the applicant in a more costly risk classification than the classification that was used in illustrations given to them at the time of policy application. Compare SER238-61 (Bedelian Verified Standard Non-Tobacco illustration) with SER263-293 (Bedelian Standard Tobacco illustration); SER185-208 (Howlett Elite Non-Tobacco illustration) with SER210-33 (Howlett Standard Non-Tobacco illustration); SER130-53 (Spooner Elite Non-Tobacco illustration) with SER155-79 (Spooner Standard Non-Tobacco illustration).

## 2. The Claims At Issue

Plaintiffs allege that LSW engaged in unlawful and unfair business practices, in violation of California's Unfair Competition Law ("UCL") in its sales of the policies. ER291-295 (¶¶ 63–73). On Plaintiffs' Motion for Partial Summary Judgment, the district court found that LSW's illustrations violated two provisions of the Illustration Statute – Sections 10509.956(b)(4) and 10509.956(e)(3). ER375-80.

The illustrations violate Section 10509.956(b)(4) because they fail to identify and provide a brief definition of column headings and key terms pertaining to guaranteed interest, including "Guaranteed Values at 2.00%" for Provider illustrations, and "Guaranteed Values at 2.50%" for Paragon illustrations. ER375-377.

LSW's failure to define these key terms and column headings is significant because the illustrations fail to disclose to consumers that the guaranteed interest rates are not true annual interest rates. Rather, the guaranteed interest rates are retroactively calculated average rates. The significance of this nondisclosure can be appreciated by the following hypothetical: assume that the S&P 500 gained 0% in each of the first four years of a five-year Equity Indexed segment of the Provider policy and gained 10% in the fifth year of this segment. Applying a true annual interest rate guarantee of 2.00% per year would result in the policyholder's being

13

credited with 18% interest (2.00% in each of the first four years plus 10% in the fifth year) plus approximately 0.4% for the effect of compounding. But under LSW's retrospective average approach, the ten percent earned in year five is spread over the entire five year time period. Because the average gain over the five year period is 2.00%, LSW would not provide any guaranteed interest other than approximately 0.4% to reflect compound interest. SER323-24 (94:10-95:7), SER315 (9:9-23).

Plaintiffs submitted evidence showing that a true annual guarantee would provide interest credits in approximately one out of every three years, for an average gain of 0.57% (Provider) and 0.74% (Paragon) per year, while the retrospective guarantee would not provide any interest credits. SER304-06 (¶¶24-25). The expected value of the policies would be approximately 44% (Provider) and 50% (Paragon) higher with a true annual guarantee than with LSW's retrospective guarantee. *Id.*

In addition to LSW's violation of Section 10509.956(b)(4), the district court found that LSW violated Section 10509.956(e)(3) by unlawfully showing a nonguaranteed eleventh-year elimination of the Monthly Percent of Accumulated Value Charge ("MPAVC") in the Paragon illustrations without describing this nonguaranteed element in the policies. ER378-80, ER382. LSW's inclusion of the eleventh-year elimination of the MPAVC in its Paragon illustrations is significant

14

because it inflated the expected value of the policies as depicted in the illustration by approximately 41% above what LSW was legally permitted to depict.  SER306 (¶26).

### 3. LSW's Irrelevant or Misleading Factual Statements

#### a. Facts Concerning The Policies

LSW misleadingly asserts that "Provider and Paragon policies provide a cash value that grows while the policies are in force and a death benefit when the insured dies."  AOB at 4.  Whether the cash value grows depends on whether interest credited exceeds fees deducted and whether the policyholder keeps putting money into the policy to keep it from lapsing.  For example, Mr. Howlett paid $105,750 in premiums, but fees reduced the cash value of his policy to $53,495.45 (below the level of the surrender charge), whereupon LSW declared the policy terminated without value (i.e., lapsed).  SER182 (¶7, Howlett).  Ms. Spooner, Ms. Walker, and Mr. Guevara all surrendered their policies and incurred losses ranging from $4,008 to $81,366.  SER127 (¶7, Spooner), SER98 (¶7, Walker), ER356-57 (¶8, Guevara).  Ms. Bedelian still has her policy, but the value of the policy is significantly lower than the premiums she has paid into the policy.  ER236 (¶6).

#### b. Facts Concerning Plaintiffs and Plaintiffs' Claims

LSW makes numerous assertions about the purportedly individualized nature of the sales process and about the supposed decision-making processes of the various Plaintiffs.  *See* AOB at 5-12.  LSW fails to explain how these purported

15

facts are relevant to its appeal.  To the extent that LSW seeks to suggest that the named Plaintiffs did not actually rely on their illustrations in deciding to purchase their policies, the suggestion would not be relevant to any issue on appeal because whether the Plaintiffs relied on the illustrations is a common issue, as the district court found and LSW does not challenge on appeal.  ER9, ER12-14.

Moreover, on summary judgment the district court *rejected* LSW's attempts to demonstrate that Ms. Walker, Mr. Howlett, and Ms. Spooner did not rely on their illustrations in deciding whether to purchase their policies.  ER369 ("Accordingly, LSW has set forth no evidence to demonstrate a lack of actual reliance.")  LSW did not seek summary judgment on reliance with respect to Mr. Guevara and Ms. Bedelian.  However, both of them have testified that the illustrations were a substantial factor in their decision to purchase their policies, which LSW's misleading discussion of the evidence does not contradict.  ER356 (¶6, Guevara); SER235-36 (¶4, Bedelian).  The district court can evaluate that evidence at trial, but in any event the district court correctly found that whether the Plaintiffs relied on the illustrations is a common issue.  See ER9, ER12-14.  LSW does not explain the relevance of its assertions about why or how Ms. Walker, Mr. Howlett, and Ms. Spooner sought to rescind or surrender their policies, AOB at 9-10, and there is none.

LSW erroneously suggests in several portions of its opening brief that Plaintiffs' theory of injury is based solely on the theory that "the alleged informational deficiencies present in the sales and purchase process caused policyholders to overpay for their policies." AOB at 14, 18, 33. In fact, as LSW's answer to Plaintiffs' Rule 23(f) petition acknowledged, Plaintiffs allege not only an overpayment theory but also a refund theory premised on the fact that they would not have purchased the policies at all but for LSW's violations of the Illustrations Statute. *See* Request for Judicial Notice, Ex. B, at 4 (describing Plaintiffs' claims as that the "asserted violations in their illustrations caused them to purchase and/or overpay for their policies."); *see also id.* at 6, 11. As the district court stated in its Order Granting Class Certification, Plaintiffs seek restitution under both an "intrinsic value" theory and a "refund" theory, as well as rescission and declaratory and injunctive/declaratory relief and, further, that these theories of recovery can be determined with common proof and do not defeat predominance. ER14-18.[5]

LSW makes several attempts to conflate the "bait and switch" claims tried in 2014 with the current claims. Contrary to LSW's assertion, Plaintiffs' current claims are different than the "bait and switch" claims tried in 2014. (AOB at 16.) As this Court has stated, the bait and switch claims were premised on "differences

---

[5] While Plaintiffs' expert has disclaimed a price premium theory of injury, see AOB at 18, Plaintiffs continue to pursue their intrinsic value and refund theories.

between the illustrations and the actual policies." ER387. In contrast, the claims

at issue now are based on violations of the Illustration Statute. The guaranteed

interest claim is based on LSW's failure to define "Guaranteed Values at 2%" and

"Guaranteed Values at 2.5%," in violation of the Section 10509.956(b)(4). The

MPAVC claim is based on LSW's showing the elimination of the MPAVC in the

illustrations when doing so was prohibited by Section 10509.956(e)(3). Moreover,

the MPVAC elimination claim bears no relation to any of the claims tried in 2014.

LSW's suggestions to the contrary at pages 15 and 17 of its opening brief refer to a

different charge (the Monthly Administrative Charge) and a different theory of

recovery (that the illustration presented a reduction of the Monthly Administrative

Charge as guaranteed when it was not guaranteed).

### B.    Procedural History Relevant to This Appeal

#### 1.    The Class Certification Motion

Plaintiffs moved for class certification on May 11, 2018, seeking

certification of a class defined as:

> All persons who purchased a Provider Policy or Paragon
> Policy from Life Insurance Company of the Southwest
> that was issued between September 24, 2006 and August
> 30, 2015, and who resided in California at the time the
> Policy was issued.

ER5. In the alternative, Plaintiffs sought certification of a class defined as:

> All persons who purchased a Provider Policy or Paragon
> Policy from Life Insurance Company of the Southwest
> that was issued between September 24, 2006 and August

30, 2015, who resided in California at the time the Policy
was issued, and who received an illustration on or before
the date of policy application.

*Id*. Plaintiffs argued that their first proposed class definition was the correct

definition and sought certification of the alternative definition only in the event

that the district court agreed with LSW's argument that the class must be limited to

individuals who received an illustration on or before the date of policy application.

SER489-90; ER253-257.

On July 31, 2018, the district court issued an order granting class

certification. The district court rejected Plaintiffs' primary class definition, and

instead adopted the alternative proposed definition and modified the relevant class

period to end on April 27, 2014 instead of August 30, 2015. ER5-7. The district

court noted that on summary judgment it held that "Plaintiffs must demonstrate

actual reliance given that the gravamen of Plaintiffs' TAC is based on LSW's

alleged misrepresentations. Plaintiffs claim that they have purchased and overpaid

for life insurance policies because of LSW's statements and omissions." *Id.* at 5.

The court held that, "[n]o potential class member could claim to have purchased

and overpaid for an LSW policy based on statements and omissions in the

illustrations if he or she had not seen an illustration before the sale." *Id.* On that

basis, the district court rejected Plaintiffs' broader proposed class definition, and

instead limited the class to include only those policyholders who received an

illustration on or before the date of policy application.  The district court reasoned that,

> [T]here is no evidence that the named Plaintiffs reviewed the final "batch" illustrations[6] that they received with their policies.  (See id. at 11.)  Instead, the only evidence that the named Plaintiffs were exposed to the misrepresentations prior to purchasing their policies is that they received and reviewed illustrations prior to applying.  (See Docket No. 859-1 ¶¶ 62, 74.)  Therefore, pursuant to Plaintiffs' theories of liability and the evidence submitted, all potential class members must have been actually exposed to an illustration prior to applying for Provider or Paragon policy.

Id. at 5-6.

## 2. The Motion For Reconsideration Of The Class Certification Order

On August 14, 2018, within 14 days of the district court's Order Granting Class Certification, Plaintiffs moved for reconsideration of the class certification order.  Specifically, Plaintiffs sought reconsideration of the district court's decision to limit the class to those purchasers "who received an illustration on or before the date of policy application." ER139-42.

---

[6] [Footnote 2 from page 6 of Order] "At the hearing on the motion, Plaintiffs argued that the date of sale, not the date of application, is the relevant date to determine class membership. As discussed, there is no evidence that Plaintiffs reviewed the illustrations they received upon delivery of their policies. Instead the only evidence of actual exposure is evidence that Plaintiffs reviewed illustrations prior to applying. Moreover, the court has adopted Plaintiffs' own proposed alternative class definition."

20

In their Motion for Reconsideration, Plaintiffs argued that the certification order appeared to accept Plaintiffs' argument that a class member did not need to receive an illustration at or before the time of application as long as the illustration was received prior to the conclusion of the purchase. ER139-40.  Plaintiffs pointed out that the certification order appeared to be based on typicality or adequacy of representation considerations, specifically on the finding that the named Plaintiffs could not represent policyholders who received an illustration only after policy application because each of the named Plaintiffs received an illustration on or before the date of policy application and did not review the illustration received at the time of policy delivery.  ER139-41.

Plaintiffs argued that reconsideration of the class certification order was warranted because the class certification order failed to consider the fact that Plaintiff Taline Bedelian could represent policyholders who received an illustration provided at the time of policy delivery; Ms. Bedelian had stated, in a declaration submitted with Plaintiffs' motion for class certification, that she reviewed and signed the illustration that was provided to her at the time her policy was delivered. ER140, ER145-48; SER235 (¶3).

Plaintiffs also argued that all the named Plaintiffs could represent all policyholders because all the illustrations were substantively the same. ER140-41, ER149-51.  Moreover, because all policyholders received at least one illustration at

21

or before the time of policy delivery, all policyholders received at least one illustration before concluding the purchase of a policy and should therefore be included in the class. *Id.*

On September 10, 2018, the district court denied Plaintiffs' motion without prejudice because Plaintiffs' meet and confer with LSW's counsel concerning the Motion for Reconsideration did not occur "at least seven (7) days prior to the filing of the motion" as required by Local Rule 7-3. SER35-36.

Nevertheless, in denying Plaintiffs' motion, the district court's order authorized Plaintiffs to re-notice the motion with a showing of compliance with Local Rule 7-3. *Id.* Following the parties' further meet and confer in accordance with Local Rule 7-3, Plaintiffs re-noticed their motion for reconsideration on September 19, 2018. SER28-34.

On October 22, 2018, the district court denied Plaintiffs' motion. The district court agreed that, in light of Plaintiff Taline Bedelian's declaration, the certification order was incorrect in finding that none of the named Plaintiffs reviewed a batch illustration. Nevertheless, the district court found that this error was not material to the class definition. ER55. The court reasoned that "[e]ven with evidence that named Plaintiffs reviewed batch illustrations, it is impossible for that review to have occurred prior to purchase, and thus impossible for

misrepresentations contained therein to have been relied upon in purchasing the policy." *Id.*

The district court stated that the "turning point of the class definition is the point of 'purchase.'" ER56. While the court agreed with Plaintiffs that a sale does not occur at the point of application, the court found that a purchase (or sale) occurs "upon delivery of the policy, which triggers the free look period." *Id.* In so finding, the court rejected Plaintiffs' argument that a sale could not be concluded "until a prospective purchaser 'accepts' the policy by deciding not to return it at some unspecified point after policy delivery, i.e., during the free look period." *Id.*

The district court further found that the "free look period occurs after the sale is concluded." *Id.* Lastly, the court found that "[s]ince Plaintiffs' claims depend on review of and reliance on deficient illustrations prior to sale, purchasers who received only batch illustrations are not proper members of Plaintiffs' proposed class." *Id.*

### 3. The Petition For Permission To Appeal Order Granting Plaintiffs' Motion For Class Certification And Order Denying Plaintiffs' Motion For Reconsideration

On November 5, 2018, within 14 days of the district court's October 22, 2018 Order Denying Plaintiffs' Motion for Reconsideration of the July 31, 2018 Order Granting Plaintiffs' Motion for Class Certification, Plaintiffs petitioned this Court for permission to appeal the district court's orders pursuant to Federal Rule

of Civil Procedure 23(f). Plaintiffs sought review of whether a life insurance purchaser is entitled to review and rely on a policy illustration in deciding whether to accept a life insurance policy and whether to exercise the right to cancel the policy during the free look period. *See* Plaintiffs' Request for Judicial Notice Notice, filed concurrently herewith, Ex. A, at 5-6. On February 26, 2019, this Court granted the petition and ordered the parties additionally to "address whether [Plaintiffs'] petition No. 18-80159 is procedurally proper. *See Nutraceutical Corp. v. Lambert*, 586 U.S. __ (2019)." SER2.

## VI. SUMMARY OF THE ARGUMENT

### A. Plaintiffs' Appeal

Plaintiffs' Petition is procedurally proper because the district court's October 22, 2018 Order Denying Plaintiffs' Motion for Reconsideration is in substance and effect an order denying class certification for purposes of Rule 23(f) for those policyholders who only received illustrations at the time of policy delivery, and Plaintiffs filed their Rule 23(f) Petition within 14 days of that order. Alternatively, even if it were necessary for Plaintiffs to preserve their ability to file a Rule 23(f) petition by taking action within 14 days of the July 31, 2018 Order Granting Class Certification, Plaintiffs did so, and thus their Petition is procedurally proper.

The district court committed legal error when it held that consumers who received illustrations only at the time of policy delivery (as opposed to the time of

policy application) could not possibly have relied on the illustrations and thus had to be excluded from a class action brought on behalf of all persons who purchased Provider or Paragon equity-indexed life insurance policies from LSW during the relevant time period. The district court arrived at its erroneous conclusion by finding that a policy of life insurance is binding on the prospective purchaser the moment the policy is delivered, thereby denying the prospective purchaser any opportunity to review or rely on the policy illustration in deciding whether to commit to the contract.

The district court committed legal error in excluding those purchasers who received illustrations only at the time of policy delivery because it (1) ignored contract law principles in finding that a life insurance policy is binding on a consumer upon delivery irrespective of the consumer's acceptance of the policy; (2) ignored the requirements of, and policies underlying, Section 10509.958, which guarantees that each purchaser of a life insurance policy must be provided with an illustration "no later than the time the policy is delivered"; and (3) ignored the requirements of, and policies underlying, Section 10127.9, which provides the purchaser of a life insurance policy an unqualified right to cancel the policy within ten days after acceptance.

Sections 10509.958 and 10127.9 demonstrate the Legislature's recognition of the complexity of life insurance illustrations and policies and grant consumers

ten days beyond acceptance of the policy within which to review the illustration and policy (or indeed any other information) before becoming legally committed to the insurance contract. All purchasers of LSW's policies should have been included in the certified class because all of them received an illegal illustration no later than policy delivery and were entitled to review and rely on it in deciding whether to become legally committed to the Policy.

### B. LSW's Appeal

If the Court finds in favor of Plaintiffs on their appeal, the Court need not reach the merits of LSW's appeal because there would be no need to determine which policyholders received illustrations on or before the date of policy application. Since LSW's argument on appeal is premised on the need to determine which policyholders received applications at or before the time of application, LSW's argument would become moot, and its appeal should be dismissed.

If the Court were to reject Plaintiffs' appeal, and thus find that purchasers who received only batch illustrations must be excluded from the class, the Court should nevertheless affirm the district court's certification of Plaintiffs' alternative proposed class, defined to include all purchasers of LSW's policies who received an illustration at or before the time of policy application. The district court did not abuse its discretion in certifying the class. The court considered the difficulties of

individualized class membership determinations and found that they did not defeat predominance. Contrary to LSW's assertions, the district court did not hold that class membership issues were exempt from predominance analysis, though such a holding would have been proper under the plain text of Rule 23(b)(3). Moreover, the certified class definition turns on a simple objective fact – receipt of an illustration at or before application – and does not create a "fail safe" class or improperly embed a merits issue in the class definition.

The district court found common questions regarding numerous issues, including violation of the Illustration Statute (which the court adjudicated against LSW on summary judgment), reliance, materiality, injury, restitution, rescission, and injunctive or declaratory relief. ER9, ER12-18. These common questions plainly predominate over individualized class membership issues. Certification would be proper even without considering the teachings of *Briseno,* and the propriety of certification is undeniable in light of *Briseno*'s clear instruction that district courts can and should use claims administration tools to determine class membership even if considerable difficulties would be encountered (as was the case in *Briseno).* Regardless of how the district court articulated its interpretation of *Briseno*, the record amply demonstrates that certification was proper, and this Court may affirm on any basis supported by the record. LSW's appeal should be denied.

## VII.  ARGUMENT

### A.  PLAINTIFFS' APPEAL SHOULD BE GRANTED, THUS INCLUDING ALL PURCHASERS IN THE CLASS REGARDLESS OF WHEN THEY RECEIVED THEIR ILLUSTRATIONS

#### 1.  Plaintiffs' Petition Is Procedurally Proper

Plaintiffs filed their Rule 23(f) petition within 14 days of the relevant order, which is the October 22, 2018 Order Denying Motion for Reconsideration that adopted the erroneous class certification analysis at issue in Plaintiffs' appeal. Plaintiffs could not have appealed this error before the October 22, 2018 Order. Moreover, even if the July 31, 2018 Order Granting Class Certification were viewed as triggering a deadline for a Rule 23(f) petition, that deadline was negated by the filing of Plaintiff's Motion for Reconsideration on August 14, 2018, which rendered the July 31,2018 Order Granting Class Certification not final for purposes of appeal.

Federal Rule of Civil Procedure 23(f) provides that a party may seek permission from an appellate court to appeal from an order granting or denying class-action certification.  Fed. R. Civ. P. 23(f).  The petition must be filed "within 14 days after the order is entered."  *Id.  Nutraceutical Corp. v. Lambert*, 586 U.S. __, 139 S. Ct. 710 (2019) confirms that Plaintiffs' Rule 23(f) Petition is procedurally proper.

In *Nutraceutical*, the district court decertified a class of consumers of a dietary supplement on February 20, 2015. 139 S. Ct. at 713. Ten days following the decertification order (March 2), counsel for the named plaintiff (Lambert) informed the court at a status conference that he planned to file a motion for reconsideration. *Id.* The district court told Lambert to file the motion "no later than" March 12 – twenty days after the decertification order. *Id.* Lambert complied with the district court's schedule and filed the motion on March 12. *Id.* On June 24, the district court denied Lambert's motion. *Id.* Fourteen days later, Lambert petitioned this Court for permission to appeal the decertification order. *Id.*

This Court reviewed whether Lambert's petition was timely and held that Rule 23(f) is "non-jurisdictional, and that equitable remedies softening the deadlines are therefore generally available." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1176 (9th Cir. 2017), *rev'd*, 586 U.S. __, 139 S. Ct. 710 (2019). This Court further held that "a motion for reconsideration filed within 14 days of the certification order tolls the Rule 23(f) deadline" and "the deadline can be tolled as a result of additional equitable circumstances." *Id.* The Court found that equitable circumstances supported tolling the deadline for Lambert's petition because within 14 days of the decertification order, Lambert orally informed the court of his intention to seek reconsideration of the decertification order and the basis for his

intended filing "and otherwise acted diligently, and because the district court set the deadline for filing a motion for reconsideration with which Lambert complied." *Id.* at 1179.

The Supreme Court agreed with this Court's holding that Rule 23(f) is non-jurisdictional, but clarified that Rule 23(f)'s deadline is not amenable to equitable tolling and held that the Ninth Circuit "erred in accepting Lambert's petition on those grounds." *Nutraceutical*, 139 S. Ct. at 714-15. The Court explained that a "Rule 23(f) petition filed within 14 days of the resolution of a motion for reconsideration that was itself filed within 14 days of the original [class certification] order," does not toll Rule 23(f)'s time prescription. *Id*. at 717. Rather, "[a] timely motion for reconsideration filed within a window to appeal does not toll anything; it 'renders an otherwise final decision of a district court not final' for purposes of appeal." *Id.* (quoting *United States v. Ibarra*, 502 U.S. 1, 6 (1991) (*per curiam*)). The timely motion for reconsideration "affects the antecedent issue of when the 14-day limit begins to run, not the availability of tolling." *Id.* (*citing Ibarra*, 502 U.S. at 4, n.2). The Supreme Court declined to further address "the effect of a motion for reconsideration filed within the 14-day window" because the petitioner's motion for reconsideration was filed outside the 14-day window. *Id.* at 717 n.7.

The Supreme Court also declined to address Lambert's argument that "the District Court's order denying reconsideration was itself 'an order granting or denying class-certification' under Rule 23(f)" because "[t]he Court of Appeals did not rule on these alternative grounds, which are beyond the scope of the question presented." *Id.* at 717. *Nutraceutical* thus explicitly preserves the argument Plaintiffs make here that the petition is procedurally proper because the October 22, 2018 Order Denying Reconsideration is in substance and effect an order denying class certification for purposes of Rule 23(f), and Plaintiffs' Petition was filed within 14 days of that order.

In denying Plaintiffs' Motion for Reconsideration, the district court adopted a rationale that differed materially from that expressed in the district court's Order Granting Class Certification. On reconsideration, the district court acknowledged that it incorrectly held in its Order Granting Class Certification that none of the named Plaintiffs reviewed a batch illustration, but found that the error was immaterial because the order adopted a new rationale based on when the court believed a "purchase" to conclude. ER55. The court stated that "[e]ven with evidence that named Plaintiffs reviewed batch illustrations, it is impossible for that review to have occurred prior to purchase, and thus impossible for misrepresentations contained therein to have been relied upon in purchasing the policy." *Id.* Moreover, the "turning point of the class definition is the point of

31

'purchase,'" and a purchase is concluded "upon delivery of the policy, which triggers the free look period." *Id.* at 6. ***LSW concedes that this rationale is not present in the original class certification order***. *See* Plaintiffs' Request for Judicial Notice, Ex. B (LSW's Answering Brief to Plaintiffs' Rule 23(f) Petition) at 10 n.5.

In its answer to Plaintiffs' Rule 23(f) Petition, LSW argued that Plaintiffs' petition is procedurally improper because it seeks review of the Order Denying Plaintiffs' Motion for Reconsideration and the order was not an "order granting or denying class-action certification" and thus not subject to interlocutory review under Rule 23(f). *Id.* at 9-10. LSW's argument is formalistic in the extreme and appears to rely on nothing more than the title of the October 22, 2018 Order as one "Denying Plaintiffs' Motion for Reconsideration" rather than "denying class certification."[7] The district court correctly characterized the Motion for Reconsideration as a motion to "modify the class definition to encompass 'all

---

[7] By LSW's logic an order decertifying a class would not be appealable under Rule 23(f) because it is not "an order granting or denying class certification." But an order decertifying a class is in substance and effect an order denying class certification, and this Court will review decertification orders under Rule 23(f). *See, e.g., Smith v. Univ. of Washington, Law Sch.*, 233 F.3d 1188, 1195 (9th Cir. 2000) ("Pursuant to Rule 23(f) and our order which granted permission to appeal, we have jurisdiction over Smith's appeal from the order decertifying the Rule 23(b)(2) class"). Indeed, *Nutraceutical* itself concerned an order decertifying a class, and the Supreme Court never suggested that review was precluded under Rule 23(f).

purchasers' of the Paragon and Provider policies during the relevant time period"
and then stated that the motion "is denied." ER57. LSW cannot dispute that this
ruling denied class certification for those policyholders who only received
illustrations at the time of policy delivery.

LSW's position has been considered and rejected by the Fourth, Seventh,
and Eleventh Circuits, which have held that an appeal may be filed from either an
original class certification order or the disposition of a timely filed motion for
reconsideration. *Gary v. Sheahan*, 188 F.3d 891, 892 (7th Cir. 1999) (citing *Blair
v. Equifax Check Servs., Inc.*, 181 F.3d 832 (7th Cir. 1999); *Shin v. Cobb Cnty. Bd.
of Educ.*, 248 F.3d 1061, 1064-65 (11th Cir. 2011) (noting that "where a motion to
reconsider a class certification order is timely filed, the 10–day period to file a
Rule 23(f) petition does not start to run until the district judge rules on the motion
for reconsideration."); *Nucor Corp. v. Brown*, 760 F.3d 341, 343 (4th Cir.
2014). The Eleventh Circuit recognized the value in allowing the district court to
reconsider its class certification order, finding that the appellate court

> should err, if at all, on the side of allowing the district
> court an opportunity to fine-tune its class certification
> order rather than opening the door too widely to
> interlocutory appellate review. Because the district court
> retains the ability, and perhaps even a duty, to alter or
> amend a certification decision, a motion for
> reconsideration of a class certification order is a better
> way to correct any errors in the certification order or to
> recognize the importance of new facts.

33

*Id.* at 1064 (internal citation and quotations omitted). The Eleventh Circuit's reasoning is especially relevant to Plaintiff's petition, which sought reconsideration of an order that adopted a reason for denying certification that was not present in the original class certification order, as LSW concedes. Plaintiffs' Request for Judicial Notice, Ex. B, at 10, n.5.

Precluding appellate review of the Order Denying Reconsideration – and the district court's new rationale for limiting class membership – would render the district court's order immune from interlocutory review. Aside from being fundamentally unfair, immunizing the order from interlocutory review would defeat the purpose of Rule 23(f), which was adopted to permit interlocutory review of class certification decisions, which previously could be appealed only at the conclusion of the case. *See, e.g., Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 957-58, 959 (9th Cir. 2005). The need for Rule 23(f) review of an error concerning class certification is the same regardless of whether the error is first made in an initial order denying class certification or on a motion for reconsideration. Plaintiffs could not have appealed the denial that is the subject of this appeal until the district court handed down its October 22, 2018 Order Denying Reconsideration.

While the foregoing rationale is sufficient to establish the propriety of this appeal and is not foreclosed by *Nutraceutical*, the Supreme Court's reasoning in *Nutraceutical* provides a second rationale for why this appeal is proper.

Even if one accepts the premise that the entry of the July 31, 2018 Order Granting Class Certification triggered a deadline for Plaintiffs to file a Rule 23(f) petition, Plaintiffs' August 14, 2018 filing of their Motion for Reconsideration rendered the July 31, 2018 order "not final for purposes of appeal." *Nutraceutical*, 139 S. Ct. at 717.

While Plaintiffs' Motion for Reconsideration was summarily denied *without prejudice* because the parties' meet and confer occurred less than seven days prior to the filing of the motion, the district court expressly invited Plaintiffs to re-notice their motion upon a showing that the parties had met and conferred in accordance with the local rule. SER35-36. Plaintiffs engaged in further meet and confer with LSW and re-noticed their previously filed motion on September 18, 2018. SER28-34. On October 22, 2018, the district court denied Plaintiffs' Motion for Reconsideration. ER51-58. Plaintiffs filed their Rule 23(f) petition with this Court on November 5, 2018, within 14 days of the district court's denial of Plaintiffs' Motion for Reconsideration.[8] Thus, even if this Court finds that in order for

---

[8] To the extent LSW may argue that Plaintiffs' Petition was untimely because Plaintiffs' original motion for reconsideration was denied on procedural grounds and their Petition was filed 14 days after denial of their re-noticed motion for

Plaintiffs to have preserved their ability to file a Rule 23(f) petition it was necessary for Plaintiffs to have taken action within 14 days of the July 31, 2018 Order Granting Class Certification, Plaintiffs' 23(f) petition would still be procedurally proper because Plaintiffs filed for reconsideration within 14 days of the July 31, 2018 order, which rendered that order not final for purposes of appeal.

In its recent opinion applying *Nutraceutical*'s instruction that "in general, '[a] timely motion for reconsideration . . . renders an otherwise final decision of a district court not final' for purposes of appeal," *Myers v. Commissioner of Internal Revenue Service*, ____F.3d ____, (D.C. Circuit, July 2, 2019), 2019 WL 2750850 at *3, the D.C. Circuit found that a motion for reconsideration was the "functional equivalent" of a "motion to vacate or revise" that would toll the time for appeal of a Tax Court decision. The Court found the appeal from the denial of reconsideration timely and noted that "the Federal Rues of Appellate Procedure 'were not adopted to set traps and pitfalls by way of technicalities for unwary

---

reconsideration, LSW has waived the argument because it failed to assert the argument in its answering brief to Plaintiffs' Petition. *See Nutraceutical*, 139 S. Ct. at 714 (finding the time limitation of Rule 23(f) can be waived or forfeited by an opposing party). Instead, LSW argued that Plaintiffs' 23(f) Petition was procedurally improper because Plaintiffs sought review of the Order Denying Plaintiffs' Motion for Reconsideration, which LSW contends is not an order granting or denying class certification. Plaintiffs' Request for Judicial Notice, Ex. B, at 9). Moreover, LSW never objected to Plaintiffs' original motion for reconsideration for the failure to meet and confer at least seven days before the filing of the motion; rather, this issue was raised *sua sponte* by trial court.

litigants.'"  *Id.* at \*4 (quoting *Des Isles v Evans*, 225 F.2d 235, 236 (5th Cir. 1955).

The same is true of Rule 23(f).  Plaintiffs' Rule 23(f) petition is procedurally

proper.

> **2.    The District Court Committed An Error Of Law In Finding That Consumers Who Received Illustrations Only At The Time of Policy Delivery Could Not Satisfy The Reliance Element Of The UCL And Therefore Could Not Be Members Of The Plaintiff Class.**

> **a.    The Reliance Requirement Of The UCL**

The district court's decision to exclude people who received only batch

illustrations from the class was based on the court's conclusion that a batch

illustration cannot be reviewed "prior to purchase, and thus [it is] impossible for

the misrepresentations contained therein to have been relied upon in purchasing the

policy."  ER55. This conclusion misconceives the nature of the reliance inquiry

under the UCL and is incorrect as a matter of law.  The district court's error is

therefore subject to *de novo* review.  *Yokoyama*, 594 F.3d at 1091.

The reliance inquiry in this action – like all other UCL actions – turns on

whether the consumer relied to his or her detriment on information (or actionable

omissions) from the seller.  This conclusion is implicit in the UCL's injury

requirement, as Business and Professions Code §17204 states that a plaintiff must

have "suffered injury in fact and has lost money or property as a result of the unfair

competition."  *See, e.g.*, *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 596

(9th Cir. 2012) (the focus of the reliance inquiry is on the information (or actionable omissions) which the consumer was exposed to prior to purchasing or leasing.).  A consumer cannot suffer injury from the purchase of a life insurance policy unless and until the consumer becomes legally committed to the contract.

Given the undisputed facts and law applicable to the illustrations, the district court erred as a matter of law in finding that consumers who received only batch illustrations could not review and rely on them for purposes of the UCL.  Implied in that conclusion is the premise that the proposed class members were legally committed to the policies the moment the illustrations (and policies) were handed to them.  As demonstrated below, that premise is incorrect as a matter of both contract law and the regulatory overlay provided by the Illustration and Free Look Statutes.

### b.  The District Court's Flawed Reliance Analysis

#### (i)  The district court ignored contract law principles in finding that a life insurance policy is binding on a consumer upon delivery irrespective of the consumer's acceptance of the policy.

In excluding from the class policyholders who received illegal illustrations only at the time of policy delivery, the district court held that "it is impossible for [review of an illustration provided at the time of policy delivery] to have occurred prior to purchase, and thus impossible for misrepresentations contained therein to

have been relied upon in purchasing the policy." ER55. The district court reasoned that a "purchase (or, equivalently, sale) occurs upon delivery of the policy, which triggers the free look period." ER56. The court's ruling conflicts with basic contract law principles.

Contract law requires offer and acceptance, where "an offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 271 (2001) (quoting *City of Moorpark v. Moorpark Unified Sch. Dist.*, 54 Cal. 3d 921, 930 (1991)). When an offer is communicated to the offeree and an acceptance is communicated to the offeror, there can be mutual assent to the contract. *Id.* at 270-71.

At the hearing on the motion for reconsideration, Plaintiffs pointed out that formation of a contract requires offer and acceptance and argued that the delivery of the policy does not conclude the formation of a contract but instead serves merely as an offer being made by LSW to the prospective purchaser. SER3-6 (3:19-6:9). The district court rejected Plaintiffs' contract argument and held, "[t]he contract analysis which Plaintiffs offered at oral argument does not change the relevant point for determining reliance, namely, receipt of the sales illustration prior to executing the application." ER56. The Order Denying Plaintiffs' Motion for Reconsideration, however, does not explain why the contract analysis is wrong,

and it is not wrong: LSW makes an offer to a prospective purchaser when it delivers a policy, and a prospective purchaser must accept that offer before the prospective purchaser can be bound to the contract.

The district court's rationale regarding when the policyholder is bound to the insurance contract is erroneous because submitting the application creates no obligation on the part of the applicant to conclude a purchase of the policy (and, indeed, imposes no obligation on LSW to issue a policy). SER44-47. If LSW chooses to issue a policy, the policy will be offered to the prospective purchaser at the time of policy delivery, along with an illustration of the policy as issued if such an illustration has not already been provided. [9] Cal. Ins. Code §10509.958; *see also* ER443-44. Contrary to the district court's holding, an insurance policy is not like a summons and is not binding on the prospective purchaser as soon as it is received. Even if delivery of the policy may bind the insurer, acceptance is required to bind the insured: "'It is a general rule that the receipt of a policy and its acceptance by the insured without an objection binds the insured as well as the insurer and he cannot thereafter complain that he did not read it or know its

---

[9] Even after a policy is issued, LSW cannot be bound to the policy before the policy is delivered to the applicant. LSW instructs its agents not to deliver the policy if the applicant has suffered a change in health since the time of application. SER82.

terms.'" *Hackethal v. Nat'l Cas. Co.*, 189 Cal. App. 3d 1102, (1987) (quoting *Aetna Casualty & Surety Co. v. Richmond*, 76 Cal. App. 3d 645, 652 (1977)).

The flaw in the district court's analysis is also apparent from the fact that its analysis applies just as much to the policy as to the illustration. Under that analysis, a prospective purchaser is bound to the policy the moment it is received even though the prospective purchaser has had no chance to read the policy. But to say that consumers are bound by the contract despite never having had the chance to read it conflicts with the most basic notions of contract formation. *See, e.g.*, *Rosenthal v. Great Western Fin. Secs. Corp.*, 14 Cal. 4th 394, 425 (1996) (a contract may be avoided by negating apparent assent where a party had "no reasonable opportunity to learn the truth" of the basic character of the documents); *Schlessinger v. Holland Am., N.V.*, 120 Cal. App. 4th 552, 559 (2004) ("passenger need not have actually read or been aware of the provision to be bound by it, so long as he or she had an opportunity to review the contract before boarding.").

The district court's rationale also ignores the fact that there can be no lawful sale of a policy until an illustration of the policy as issued is signed by the purchaser. Cal. Ins. Code §10509.958. It makes no sense to find that a consumer cannot read and rely on the very document that he or she must sign in order for a lawful contract to arise.

The district court's conclusion also conflicts with evidence of how policies are actually sold in the real world. LSW's records indicate that 5,960 issued policies were "Not Taken" and another 89 policies were "Free Look." SER39 (¶3), SER90 (¶4). This indicates that 5,960 prospective purchasers did not accept a policy LSW issued, and 89 prospective purchasers accepted the policy LSW issued to them but subsequently returned the policy during the free look period. LSW thus recognizes that a prospective policyholder can avoid being bound to a policy *either* by not accepting it *or* by cancelling it during the free look period.

The district court's decision to exclude policyholders who received only batch illustrations from the class is incorrect because it is based on the flawed premise that as a matter of contract law consumers are bound by a policy the moment it is handed to them, regardless of whether they have ever had the chance to review the accompanying illustration or, indeed, the policy itself.

> **(ii)  The district court ignored the requirements of, and policies underlying, the Illustration and Free Look Statutes**

In enacting the Illustration Statute, the California Legislature made clear that it sought "to ensure that illustrations do not mislead purchasers of life insurance and to make illustrations more understandable by providing illustration formats, prescribing standards to be followed when illustrations are used, and specifying the

42

disclosures that are required in connection with illustrations." Cal. Ins. Code §10509.950.

While considerations of contract law are sufficient to insure that no consumer was bound by an LSW policy until they had accepted the policy after having had an opportunity to review the illustration and policy, the regulatory regime set up by the California Legislature provides still additional protections for consumers that give them the right to review and rely on their illustrations before being legally committed to their policies.

The Illustration Statute makes clear that a policy illustration is an essential piece of information that *must* be provided to every purchaser of a life insurance policy at or before the time of policy delivery. Cal. Ins. Code §10509.958. Section 10509.958 provides that where a basic illustration "is used in the sale of a life insurance policy" the illustration must be signed and a copy provided to the applicant. Cal. Ins. Code §10509.958(a)(1). Moreover, where a policy is issued other than as applied for by the consumer, the insurer must provide a revised basic illustration no later than the time of policy delivery, and this illustration must be signed by the consumer. Cal. Ins. Code §10509.958(a)(2). If no illustration was used, or if the policy applied for differs from what was previously illustrated, the insurer must provide a basic illustration conforming to the policy as issued no later

43

than the time the policy is delivered, and this illustration must be signed by the consumer.  Cal. Ins. Code §10509.958(b).

Section 10509.958 thus guarantees consumers the right to receive an illustration of the policy they are considering purchasing no later than the time of policy delivery.  But the court's holding – that the purchase of a policy is concluded at the moment of policy delivery – renders this guarantee meaningless because, under the district court's ruling, the purchase of the policy is concluded before the prospective purchaser has had the opportunity to review the illustration.

Likewise, the district court's reasoning conflicts with the requirements of, and policies underlying, the Free Look Statute.  The Free Look Statute provides, "Every individual life insurance policy and every individual annuity contract that is initially delivered or issued for delivery in this state . . . shall have printed on the front of the policy jacket or on the cover page a notice stating that, after receipt of the policy by the owner, the policy may be returned by the owner for cancellation . . . not less than 10 days nor more than 30 days" from the date of policy receipt. Cal. Ins. Code §10127.9(a)(1).  The Statute recognizes that policy contracts and illustrations are complicated materials for a prospective purchaser to understand. The provision therefore does not require that consumers commit to a policy when the prospective purchaser meets with an agent to receive the issued policy.  Rather, the Free Look Statute allows the prospective purchaser to accept the policy from

the agent and thereafter provides the prospective purchaser with at least ten additional days in which to decide that he or she does not want to be bound to the contract.  Cal. Ins. Code §10127.9.

By framing the provision in terms of permitting the consumer to cancel the policy, the drafters necessarily implied that a contract between the consumer and the insurer has already arisen, as indeed it has once the consumer accepts the policy.  But regardless of whether the statute is understood to provide consumers with the right to cancel an existing contract or the right to postpone being bound to a delivered policy for ten days following delivery, the underlying policy considerations and protections remain the same – consumers must be provided at least ten days after the delivery of the policy and illustration to decide whether they want to be bound by the policy.  As the California Supreme Court held in *In re Tobacco II Cases*, 48 Cal. 4th 298, 326-27 (2009), reliance is established if the representation (or omission) at issue "has played a substantial part, and so has been a substantial factor, in influencing his decision." This analysis applies just as much to a decision not to return a policy during the free look period as it does to any other purchasing decision.

By ignoring the requirements and underlying purposes of the Illustration Statute, specifically Section 10509.958, and the Free Look Statute, the district court undermined the protections enacted by the California Legislature.  The

district court committed legal error when it held that no policyholders who received illegal illustrations only at the time of policy delivery could be members of the class.

Because all purchasers of LSW's policies received one or more illegal illustrations at or before the time of policy delivery and did not cancel the policy before the end of the free look period, all such purchasers may rely on the illegal illustrations for purposes of the UCL and should have been included in the class. The district court's ruling to the contrary should be reversed.

**B.    LSW'S APPEAL SHOULD BE REJECTED**

**1.    If The Court Grants Plaintiffs' Appeal, LSW's Appeal Should Be Rejected As Moot**

If the Court sustains Plaintiffs' appeal, then it should reject the appeal by LSW as moot because there will be no need to determine when any particular purchaser received an illustration.  Because LSW's appeal is premised on the need for individualized determinations of when each class member received an illustration, LSW's appeal fails if there is no need to make such determinations.

**2.    If The Court Denies Plaintiffs' Appeal, The Court Should Deny LSW's Appeal On the Merits Because The District Court Did Not Abuse Its Discretion In Certifying A Class Of Purchasers Who Received An Illustration On Or Before The Date Of Policy Application**

LSW fails to demonstrate an error of law, or other abuse of discretion, because the district court properly applied *Briseno*.  The district court was correct

46

in holding that issues concerning identification of class members in this case was not a sufficient basis for denying certification, including under the predominance requirement. *See* ER12.[10]

### a.    The Teachings of *Briseno*

In *Briseno*, this Court upheld certification of a class of persons who purchased Wesson-branded cooking oils labelled "100% Natural" during the relevant period. *Id.* at 1123. The trial court had granted class certification despite the fact that there were no records of plaintiffs' purchases and that class members would have to self-identify. *Id.* at 1125; *see also In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 969 (C.D. Cal. 2015). This Court affirmed. The Court rejected the notion that at the class certification stage, "class representatives must demonstrate an administratively feasible means of identifying absent class members" and held that "Rule 23 does not impose a freestanding administrative feasibility prerequisite to class certification." *Briseno*, 844 F.3d at 1123, 1126. Rather, Rule 23(b)(3)

---

[10] While Plaintiffs initially read the district court's order to adopt Plaintiffs' interpretation of *Briseno* that class membership issues are generally exempted from predominance analysis, and Plaintiffs so contended in opposing LSW's Rule 23(f) petition, a closer examination of the district court's class certification order reveals that Plaintiffs' initial interpretation of the order was perhaps a bit aspirational. While the district court's interpretation of *Briseno* is not entirely clear, nowhere in the order did the court adopt Plaintiffs' interpretation or hold that class membership issues are exempt from the predominance inquiry. The court found that the difficulties of identifying class members were not sufficient to defeat predominance. ER12.

"already contains a specific, enumerated mechanism to achieve that goal: the manageability criterion of the superiority requirement." *Id.* at 1127. The superiority requirement requires that class actions be "superior to other methods of adjudicating the controversy," and directs courts to consider the "likely difficulties in managing a class action." *Id.*

The *Briseno* Court held that requiring class representatives to satisfy a separate administrative feasibility requirement would "conflict[] with the well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns," and that courts should instead regard "manageability as one component of the superiority inquiry." *Id.* at 1128 (quoting *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 663 (7th Cir. 2015)). The Court stated, "Rule 23(b)(3) calls for a comparative assessment of the costs and benefits of class adjudication, including the availability of 'other methods' of resolving the controversy." *Id.* The Court further explained that Rule 23 contemplates that there may be individualized claim determinations after a finding of liability, at which point defendants can individually challenge the claims of absent class members via claims administrators, auditing processes, and other techniques tailored to the parties' needs. *Id.* at 1130-32.

The Court warned that an administrative feasibility prerequisite "invites courts to consider the administrative burdens of class litigation 'in a vacuum'" that

48

would often be outcome determinative for cases "in which administrative feasibility would be difficult to demonstrate but in which there may be no realistic alternative to class treatment." *Id*. (quoting *Mullins*, 795 F.3d at 663). The Court noted that Rule 23's authors directed courts to "balance the benefits of class adjudication against its costs." *Id.*

Although the *Briseno* Court did not explicitly hold that class membership issues are outside the scope of predominance analysis, Plaintiffs believe this is fairly implied by the *Briseno* opinion, particularly in light of the fact that the Court was affirming an order certifying a class of purchasers as to which there were no records of purchases and each class member would need to self-identify, yet the Court never suggested that the predominance test posed any problem for class certification.[11] Similarly, the district court in *Racies v. Quincy Bioscience, LLC*, 2017 U.S. Dist. LEXIS 206807, at *18 (N.D. Cal. Dec. 15, 2017), applying

---

[11] LSW's reliance on the *Briseno* court's citation of *Torres v. Mercer Canyons, Inc.,* 835 F.3d 1125 (9th Cir. 2016), is misplaced because, as the *Briseno* court noted, the claim in *Torres* was that the "class definition was overbroad – and thus arguably included some members who were not injured." *Briseno*, 844 F. 3d at 1125 n.4. But the class certified here is not overbroad. It includes only those people who were exposed to the illegal illustrations. LSW's reliance on *Mazza*, AOB at 26 n.6, fails for the same reason. *See Mazza*, 666 F.3d at 595-96 (finding no predominance because "it is likely that many class members were never exposed to the allegedly misleading advertisements, insofar as the advertising of the challenged system was very limited.")

*Briseno,* addressed the need for individualized determinations of who had purchased defendant's product solely as an issue of manageability/superiority.

Interpreting *Briseno* to exempt class membership issues from predominance analysis would be consistent with the plain text of Rule 23(b)(3) which provides that the court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members . . . ." Fed. R. Civ. P. 23(b)(3). By the terms of the rule, the predominance requirement takes class membership as given and focuses on whether common issues predominate over individual issues affecting people *who are class members*. Thus, *whether a person is a class member* is outside the scope of the predominance inquiry by the plain language of the rule. While LSW contends that this view "does not comport with the caselaw of other circuits which . . . subjects class membership issues to predominance scrutiny" (AOB at 37, n.12), it fails to address the text of the rule and fails to cite any case that addresses Plaintiffs' textual analysis.

Although the foregoing makes clear that the district court would have been correct in ruling explicitly that class membership issues are outside the scope of predominance analysis, the district court appears instead to have chosen a narrower interpretation of *Briseno*, under which manageability/superiority concerns are part of the balancing process in the predominance analysis.

### b.   The District Court Did Not Abuse Its Discretion In Applying *Briseno*

Contrary to LSW's assertions, the district court did not hold "that it was no longer at liberty to weigh [class membership issues] as part of Fed. R. Civ. P. 23(b)(3) predominance analysis based on the mistaken conclusion (advanced by Plaintiffs) that *Briseno* precludes predominance analysis of any issue that bears on class membership." AOB at 2. See also AOB at 22, 24-25. The district court declined to adopt Plaintiffs' interpretation of *Briseno*. Instead, the district court held,

> LSW argues that predominance is lacking because determining pre-application receipt requires individualized inquiries. (Mot., Docket No. 930 at 9.) However, the Ninth Circuit recently clarified that 'Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification.' *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017). Instead, courts must address any administrative feasibility concerns under the manageability criterion of the superiority requirement. Id. at 1127. Therefore, the concerns motivating the Court's prior Decertification Order are no longer valid justifications to find a lack of predominance. (See Order, Docket No. 447 at 3–5.)

ER12.

LSW cannot dispute the propriety of a predominance analysis that is informed by manageability/superiority concerns. In footnote 8 of its Opening Brief, LSW argues that subjecting class membership issues to predominance

analysis would not "improperly disfavor certification" because predominance analysis "balances concerns about individualized questions with the benefits of addressing common matters."  LSW then cites *In re Petrobras Securities*, 862 F.3d 250, 268 (2d Cir. 2017), for the proposition that "like superiority, predominance is a comparative standard."  AOB at 28 n.5

LSW's concession that predominance analysis includes a comparative assessment that "balances concerns about individualized questions with the benefits of addressing common matters" is fatal to LSW's position because LSW cannot show that the balance of those factors in this case tips against class certification.  To the contrary, the district court discussed at length the procedures that had been proposed for identifying class members, including the possibility of disputes and the possible need for some class members to establish their class membership through a questionnaire.  Although the district court had found the need for such individualized determinations fatal to class certification in 2013, the court reached a different conclusion in light of *Briseno*:

> [T]he Ninth Circuit has explained that "[a]t the claims administration stage, parties have long relied on 'claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court to validate claims." *Briseno*, 844 F.3d at 1131. Moreover, "Rule 23 specifically contemplates the need for such individualized claim determinations after a finding of liability." *Id*. . . . Thus, the valid manageability concerns LSW raises are insufficient to

52

>    find that a class action is a superior method of
>    adjudicating the claims.

ER19-20.

Even assuming that LSW is correct in asserting that class membership issues

may be addressed as part of the predominance inquiry, this does not mean that the

need to make individualized class membership determinations defeats

predominance. Membership in the class is an individual issue by definition and

thus *always* requires individualized determinations. Similarly, damages must

always (or nearly always) be determined individually, yet courts consistently hold

that the need for individualized determinations of damages does not defeat class

certification under the predominance requirement or any other requirement. *See,*

*e.g., Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)

("amount of damages is invariably an individual question and does not defeat class

action treatment"); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986-

88 (9th Cir. 2015) (confirming that *Yokoyama* remains the law of the Ninth

Circuit).

The *Briseno* Court itself analogized class membership issues to damages,

observing that the need to make individualized determinations of damages does not

defeat class certification and that determinations of class membership may be made

at the claims administration stage in the same way that individualized

determinations of damages are made. 844 F.3d at 1131. Although the Court's

observation was made in the context of ConAgra's due process argument, the point cannot be limited to that context. There is no reason why the need to make individualized determinations regarding class membership should defeat class certification while the need to make individualized damages determinations would not.

Nothing in the text of Rule 23(b)(3) precludes a court from factoring manageability and superiority considerations into predominance analysis. As the Supreme Court has observed, "The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. __, 136 S. Ct. 1036, 1045 (2016) (quoting *Amchem Products, Incl. v. Windsor*, 521 U.S. 591, 623 (1997)). This conception of the predominance inquiry is certainly broad enough to include the concerns identified by the *Briseno* court about the need to "balance the benefits of class adjudication against its costs." 844 F.3d at 1128.

The *Tyson Foods* court further explained, "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." 136 S. Ct. at 1045 (quoting

7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure Section 1778).

The district court properly found that common issues predominated given the presence of key common questions, including whether the illustrations violated the Illustration Statute (as the district court found on summary judgment that they did, ER375-377). The district court identified other common questions, including "(1) whether information omitted or improperly presented in the illustrations was a substantial factor in Plaintiffs' purchasing decisions; (2) whether information omitted or improperly presented in the illustrations was material to Plaintiffs' purchasing decisions; and (3) whether Plaintiffs suffered injury in fact and lost money or property as a result of LSW's violations of the Illustration Statute." ER9.[12] The Court also found common issues pertaining to remedies, including Plaintiffs' proposed methods for calculating restitution and pertaining to rescission and injunctive or declaratory relief. ER14-18.

LSW offers no basis for its assumption that class membership issues defeat predominance in this case other than the fact that in 2013 the district court found,

---

[12] In a UCL class action, only the named Plaintiffs need to establish reliance and injury. See *Mazza*, 666 F.3d at 595 (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 324-27 (2009). Whether a plaintiff relied on a representation turns on whether the representation was a "substantial factor" in the purchasing decision. *In re Tobacco II Cases*, 46 Cal. 4th at 326-27.

based on the record then before it, and without the benefit of *Briseno*'s teachings, that individualized class membership issues defeated predominance and that the class should be decertified as to the bait and switch claims. See AOB at 35-36. [13] LSW ignores the fact that the record before the district court in 2018 was a different record, based on a different class definition and different submissions from vendors about how they would determine class membership and at what cost (2018 estimates range from \$1.67 to \$3.33 per class member). SER438 (¶11), ER442-77. More importantly, in 2013 the district court did not have the benefit of *Briseno*'s clear teachings about how a court should balance the burdens of individualized class membership determinations against the benefits of the class device, as well as the importance of using tools that the court has available to it for making such individualized determinations. Based on *Briseno* and all the evidence about how class membership questions can be determined, the court rejected LSW's arguments, and LSW can show no abuse of discretion.[14]

---

[13] This Court affirmed dismissal of Plaintiffs' bait and switch claims on the merits and did not pass on the district court's 2013 decertification order. ER387-88. In reversing the dismissal of Plaintiffs' claims based on the Illustration Statute, this Court specifically directed the district court to consider "whether any class action may be maintained with respect to those claims." ER389

[14] To the extent that *EQT Prod. Co. v. Adair,* 764 F.3d 347 (4th Cir. 2014), AOB at 26-27) stands for the proposition that difficulties in identifying class members is a predominance issue, as LSW claims the *Briseno* court read it, see AOB at 27, the case simply confirms the propriety of what the district court did in this case, as the Fourth Circuit in *EQT Products* remanded the case to the district court to analyze

### c. LSW Cites No Authority That Conflicts With the District Court's Application of *Briseno*

LSW cites no authority for the proposition that it is improper for the district court to use manageability/superiority considerations in the context of predominance analysis, as the district court did here. Indeed, *In re: Petrobras Securities*, 862 F.3d 250 (2d Cir. 2017), relied on by LSW, makes clear that courts evaluating predominance should include such considerations, including particularly the court's ability to implement case management techniques tailored to the facts of the case. In *Petrobras*, the district court certified a class of persons who had purchased Petrobras debt securities in "domestic transactions." 862 F.3d at 256. The Second Circuit found that whether a particular person purchased Petrobras debt securities in a "domestic transaction" was a highly individualized "merits" issue. *Id*. at 271. Moreover, it was a highly complex merits issue that could involve, for each particular transaction, evidence "including but not limited to, facts concerning the formation of the contracts, the placement or purchase orders, the passing of title, or the exchange of money." *Id*. at 272. The appeals court reversed the district court because the district court found predominance without even considering the need to make individualized determinations of

---

"the administrative challenges it will face when using land records to determine current ownership, and assess whether any trial management tools are available to ease this process." *Id.* at 360 & n.9.

whether each member of the putative class engaged in a domestic transaction. *Id*. at 271-72. The certification order also offered "no indication that the district court considered the ways in which evidence of domesticity might vary in nature or availability across the many permutations in Petrobras Securities." *Id.* at 273. The Second Circuit reversed class certification and remanded the case for the district court to consider whether the need to determine the domestic transaction issue on an individualized basis defeated predominance. The appeals court reminded the district court of its ability to use "management tools" and stated that it took "no position as to whether, on remand, the district court might properly certify one or more classes . . . ." *Id.* at 275 & n.27.

Here the district court did what the *Petrobras* court held a district court should do – it specifically considered the difficulties of determining individual class membership in its predominance discussion, and it also considered the practical aspects of how those determinations could be made in a manageable way. ER12, ER19-20.

LSW's reliance on *True Health Chiropractic, Inc. v. McKesson Corp*., 896 F.3d 923 (9th Cir. 2018), is misplaced because the issues that defeated certification of the proposed class were not class membership issues but "individual issues in McKesson's various consent defenses." *Id.* at 928. The predominance issues raised with regard to three proposed subclasses also involved consent rather than

class membership, as to which there were no individualized questions because the subclass definitions consisted of lists of class members. *Id.* at 932.

LSW's citation of *Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015), *cert. denied*, 136 S.Ct. 1493 (2016), is baffling because the court applied predominance analysis to a merits issue – exposure to defendant's marketing campaign – that was not part of the class definition and because the appeals court affirmed class certification. Similarly, *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992 (8th Cir. 2016), addressed exposure to the allegedly illegal faxes under a predominance analysis, found no predominance problem, and reversed denial of certification. *Sandusky Wellness Center, L.L.C. v. ASD Specialty Healthcare, Inc.,* 863 F.3d 460 (6th Cir. 2017) does not help LSW because there the appeals court affirmed a district court's finding of no predominance because there was no way to identify even a single class member without an affidavit. *Id.* at 465-66. In contrast, here LSW's documents can identify approximately three quarters of the class members. ER508 n.3. This fact means both that much of the work in identifying class members could be done by eDiscovery vendors, as Plaintiffs showed, see SER443-77, and also that there would be a large number of class plaintiffs even if very few class members submitted declarations or questionnaire responses showing that they received an illustration at or before delivery. The district court in this case properly found that

that the need for individualized determinations of class membership did not defeat predominance. ER12.

LSW's cited district court cases (AOB at 28) are similarly unhelpful to its position. None stands for the proposition that the manageability and superiority concerns discussed in *Briseno* cannot be considered in the context of predominance analysis. *Victorino v. FCA US LLC,* 326 F.R.D. 282, 301 (S.D. Cal. June 13, 2018), and *Brooks v. Darling Int'l, Inc.,* 2017 U.S. Dist. LEXIS 49660, *22-23, 40 (E.D. Cal. Mar. 30, 2017), did not address problems with identifying class members but denied class certification because the class definitions that were overbroad. *J.L. v. Cissna*, 2019 U.S. Dist. LEXIS 16761, *18 (N.D. Cal. Feb. 1, 2019), found certification was proper for a class that could be determined from objective criteria: receipt of a formal agency decision letter denying Special Immigrant Juvenile status. Similarly, here the proposed class certified by the district court is readily identifiable from objective criteria – receipt of an illustration on or before the date of application. *Hilsley v. Ocean Spray Cranberries, Inc.*, 2018 U.S. Dist. LEXIS 202679, *51-52 (S.D. Cal. Nov. 29, 2018), granted the motion for class certification of UCL, FAL and CLRA claims, citing *Briseno* and finding the proposed class satisfied the requirements of 23(b)(3).

To conclude: if *Briseno* is read to include issues of identifying class members in predominance analysis, that analysis must be informed by the kinds of manageability/superiority considerations articulated in *Briseno*. *Briseno* makes clear that this Circuit expects district courts to use claims administration procedures to manage class membership determinations even if considerable efforts will be required, as they plainly were required in *Briseno* since all class members would need to self-identify. Given the numerous common issues favoring class certification as found by the district court (*see* pages 54-55, above) it is impossible to read *Briseno* to countenance denial of class certification in this case. *See, e.g.*, 844 F.3d at 1128, (noting the "well settled presumption that courts should not refuse to certify a class merely because of manageability concerns"). The district court did not abuse its discretion in finding that the difficulties with individualized class membership determinations that troubled the court in 2013 "are no longer valid justifications to find a lack of predominance." ER12.

> **d.** **Plaintiffs Have Not Created A "Fail Safe Class," Or Otherwise Defined the Class Improperly To Avoid Predominance Inquiry, Because Membership In The Class Turns On A Simple Objective Fact.**

LSW asserts that Plaintiffs have improperly embedded merits issues in the class definition in order to shield class membership issues from predominance inquiry. AOB at 32-34. LSW's arguments are irrelevant because, as discussed above at pages 50-52, the district court did not exempt class membership issues

from predominance inquiry. The issue of whether Plaintiffs improperly embedded merits issues in the class definition to shield them from predominance inquiry would arise only if the district court had accepted Plaintiffs' preferred interpretation of *Briseno*, under which class membership issues are generally exempted from predominance analysis. Even then LSW's arguments would fail because class membership under the class definition at issue here turns on a simple objective fact (receipt of an illustration on or before the date of policy application), and this Court has consistently held that such class definitions are not improper.

This Court has characterized a fail-safe class as one defined so narrowly as to "preclude[ ] membership unless the liability of the defendant is established." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016) (quoting *Kamar v. RadioShack Corp.*, 375 Fed. App'x. 734, 736 (9th Cir. 2010)); *see also Melgar v. CSK Auto, Inc*., 681 Fed. App'x. 605, 607 (2017) ("A fail-safe class is commonly defined as limiting membership to plaintiffs described by their theory of liability in the class definition such that the definition presupposes success on the merits.").

Ninth Circuit case law disapproves of precluding class certification under the fail-safe class theory. *Melgar*, 681 Fed. App'x. at 607. In any event, courts are adept at determining whether a class definition is fail-safe and look to whether the "liability standard applied by the district court required class members to prove

62

more facts to establish liability than are referenced in the class definition," *Melgar*, 681 Fed. App'x. at 607, or whether the class is defined using objective criteria that do not require a legal analysis. *Brown v. DirecTV, LLC*, 330 F.R.D. 260, 268 (C.D. Cal. 2019) (finding class definition was not fail-safe where class members could be identified using debt collectors' call logs and defendant's databases and customer agreements relevant to each customer to determine whether a customer consented to being called); *see also Panacci v. A1 Solar Power, Inc.*, 2015 WL 3750112, at *8 (finding class definition was not fail-safe where membership could be determined without reaching a legal conclusion but instead by determining whether the potential class member was listed on a do-not call registry or whether the person received a certain number of phone calls from defendants within the relevant timeframe).

In the present case, Plaintiffs have not proposed a fail-safe class definition. Class membership turns on a simple objective fact – receipt of an illustration on or before the date of policy application – and requires that class members to prove more facts to establish liability than those referenced in the class definition (e.g., reliance by the named Plaintiffs). Moreover, no legal analysis is required to determine when a policyholder received an illustration.[15]

---

[15] LSW's reliance on wage and hour cases, AOB at 32-33, is misplaced because a class defined as "all employees classified as exempt who were non-exempt" would require a highly detailed legal and factual analysis to determine each person's

Nor have Plaintiffs improperly embedded a merits issue in the class definition. "A class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a person is a member of the class," rather than "by reference to objective criteria." *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 672–73 (N.D. Cal. 2011) (citations omitted). In the present action, the Court should find that Plaintiffs did not improperly embed a merits issue in the class definition because the class definition at issue turns on a simple objective fact (receipt of an illustration on or before the date of policy application), and does not depend on a detailed factual or legal analysis.

In sum, there is nothing improper about Plaintiffs' class definition. Like the class definition in *Briseno* (all purchasers of Wesson oils labelled "100% natural" during the relevant period in the relevant states), the class definition here turns on a simple objective fact. This Court affirmed the certification of the class in *Briseno*, and it should likewise affirm certification of the class in this case.

> ### e. The Need For Individualized Determinations Of Class Membership Does Not Defeat Predominance.

LSW's appeal should also be rejected because LSW has not shown that applying predominance analysis to the question of whether a policyholder received

---

membership in the class. Class membership would not turn, as in this case, on a simple objective fact. Likewise, determining whether a person relied in a fraud case does not necessarily turn on a simple objective fact. See AOB at 33 n.11.

a pre-application illustration would require that the alternative class not be certified. Regardless of how the district court articulated its reasoning, the Court may affirm on any basis supported by the record. *E.g., Hall*, 476 F.3d at 686.

Plaintiffs submitted with their class certification motion bids from three e-Discovery vendors offering to review LSW's policyholder files to determine which policyholders received a pre-application illustration; the proposals range from $1.67 to $3.33 per class member. SER438 (¶11), ER442-77. Policyholders for whom LSW's records are unclear could submit a declaration or questionnaire response. *Briseno* is clear that this Circuit expects district courts to undertake the burdens of claims administration to determine class membership.[16] 844 F.3d at 1130-32; *see also Ms. L. v. U.S. Immigration & Customs Ent't,* 330 F.R.D. 284, 290 (S.D.Cal. Mar. 8, 2019) (difficulty in identifying class members not a bar to certification under *Briseno*, particularly where difficulty results from defendant's

---

[16] In 2013, LSW submitted a declaration that purported to demonstrate genuine questions about the date of illustration receipt for particular policyholders. SER331-37. Plaintiffs' response demonstrated that LSW's arguments were either irrelevant or makeweight, and the district court seemed to agree. See SER327-30, SER511-97, ER508 n.2. In any event, Plaintiffs are not required to establish with certainty which purchasers received illustrations at or before application. A preponderance of evidence is enough. A claims administrator could readily handle the few disputes concerning policy files that might survive good faith meet and confer among counsel. A class member who attested to receipt of an illustration at or before the time of application would ordinarily satisfy the burden of proof. In the unlikely event that LSW produced contrary evidence, a claims administrator or special master would have no difficulty resolving any dispute.

own record-keeping practices). As in *Ms. L*, LSW should not escape liability because its records, which should include agent's reports stating whether each applicant has been provided with an illustration, are incomplete. *See* SER517 (exemplar agent's report); *see also Young v. Nationwide Mutual Ins. Co.,* 693 F.3d 532, 540 (6th Cir. 2012) (to allow a defendant's recordkeeping failures to defeat class certification "would undermine the very purpose of class action remedies.").

Given the guidance from *Briseno* and the presence of common questions regarding numerous issues (including violation of the Illustration Statute, reliance, materiality, injury, restitution, rescission, and injunctive or declaratory relief), the need to determine who received pre-application illustrations would not upset the predominance of common issues found by the district court here. ER9, ER12-18. LSW has shown no abuse of discretion by the district court.

## VIII. CONCLUSION

The Court should grant Plaintiffs' appeal and deny LSW's appeal.

Respectfully submitted,

July 8, 2019

**CORNERSTONE LAW GROUP**

*s/ Brian P. Brosnahan*
Brian P. Brosnahan

**KASOWITZ BENSON TORRES LLP**

*s/ Lyn R. Agre*
Lyn R. Agre
Margaret A. Ziemianek
Veronica Nauts

*Attorneys for Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## CERTIFICATE OF COMPLIANCE

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**:  19-55241 (L), 19-55242

I am the attorney or self-represented party.

**This brief contains 15, 641 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[X] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

s/ Brian P. Brosnahan　　　　　**Date:** July 8, 2019
Brian P. Brosnahan

67

## STATEMENT OF RELATED CASES

Counsel for Plaintiffs-Appellees certifies that the only related cases pending in this Court are the two consolidated cases of 19-55241 (L), and 19-55242.

s/ Brian P. Brosnahan       **Date:** July 8, 2019
Brian P. Brosnahan

# ADDENDUM OF STATUTES AND RULES

## ADDENDUM OF STATUTES AND RULES

### United States Code Sections:

### 28 U.S.C. §1291

Final decisions of district courts

    The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

### 28 U.S.C. §1332

    (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—

        (1) citizens of different States;

        (2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

        (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

        (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

    (b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

    (c) For the purposes of this section and section 1441 of this title—

A-1

(1) a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of—

    (A) every State and foreign state of which the insured is a citizen;

    (B) every State and foreign state by which the insurer has been incorporated; and

    (C) the State or foreign state where the insurer has its principal place of business; and

(2) the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.

(d)(1) In this subsection—

    (A) the term "class" means all of the class members in a class action;

    (B) the term "class action" means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;

    (C) the term "class certification order" means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

    (D) the term "class members" means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

(2) The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which—

    (A) any member of a class of plaintiffs is a citizen of a State different from any defendant;

    (B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

    (C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

(3) A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of—

    (A) whether the claims asserted involve matters of national or interstate interest;

    (B) whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;

    (C) whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

    (D) whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;

    (E) whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

    (F) whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

(4) A district court shall decline to exercise jurisdiction under paragraph (2)—

    (A)(i) over a class action in which—

    (I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

    (II) at least 1 defendant is a defendant—

      (aa) from whom significant relief is sought by members of the plaintiff class;

      (bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

      (cc) who is a citizen of the State in which the action was originally filed; and

    (III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

(ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

(B) two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

(5) Paragraphs (2) through (4) shall not apply to any class action in which—

(A) the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

(B) the number of members of all proposed plaintiff classes in the aggregate is less than 100.

(6) In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

(7) Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint, or, if the case stated by the initial pleading is not subject to Federal jurisdiction, as of the date of service by plaintiffs of an amended pleading, motion, or other paper, indicating the existence of Federal jurisdiction.

(8) This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.

(9) Paragraph (2) shall not apply to any class action that solely involves a claim—

(A) concerning a covered security as defined under 16(f)(3) [1] of the Securities Act of 1933 (15 U.S.C. 78p(f)(3) [2]) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

(B) that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

(C) that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).

A-4

(10) For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

(11)(A) For purposes of this subsection and section 1453, a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs.

(B)(i) As used in subparagraph (A), the term "mass action" means any civil action (except a civil action within the scope of section 1711(2)) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

(ii) As used in subparagraph (A), the term "mass action" shall not include any civil action in which—

> (I) all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State;

> (II) the claims are joined upon motion of a defendant;

> (III) all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action; or

> (IV) the claims have been consolidated or coordinated solely for pretrial proceedings.

(C)(i) Any action(s) removed to Federal court pursuant to this subsection shall not thereafter be transferred to any other court pursuant to section 1407, or the rules promulgated thereunder, unless a majority of the plaintiffs in the action request transfer pursuant to section 1407.

(ii) This subparagraph will not apply—

> (I) to cases certified pursuant to rule 23 of the Federal Rules of Civil Procedure; or

> (II) if plaintiffs propose that the action proceed as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure.

(D) The limitations periods on any claims asserted in a mass action that is removed to Federal court pursuant to this subsection shall be deemed tolled during the period that the action is pending in Federal court.

(e) The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.

**California Code Sections:**

**Cal. Bus. & Prof. Code §17204**

Actions for Injunctions by Attorney General, District Attorney, County Counsel, and City Attorneys

Actions for relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or a district attorney or by a county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, or by a city attorney of a city having a population in excess of 750,000, or by a city attorney in a city and county or, with the consent of the district attorney, by a city prosecutor in a city having a full-time city prosecutor in the name of the people of the State of California upon their own complaint or upon the complaint of a board, officer, person, corporation, or association, or by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition.

**Cal. Ins. Code § 10509.950**

In order to protect consumers and foster consumer education, this chapter shall govern the regulation of life insurance policy illustrations. It is the intent of the Legislature in enacting this chapter to ensure that illustrations do not mislead purchasers of life insurance and to make illustrations more understandable by providing illustration formats, prescribing standards to be followed when illustrations are used, and specifying the disclosures that are required in connection with illustrations. Insurers should, as far as possible, eliminate the use of footnotes and caveats and define terms used in the illustration in language that is understandable by a typical person within the segment of the public to which the illustration is directed.

**Cal. Ins. Code § 10509.952**

This chapter shall apply to all group and individual life insurance policies and certificates except as follows:

(a) Variable life insurance.

(b) Individual and group annuity contracts.

(c) Credit life insurance.

(d) Life insurance policies with no illustrated death benefits on any individual exceeding ten thousand dollars ($10,000).

**Cal. Ins. Code §10509.953**

As used in this chapter:

(a) "Actuarial Standards Board" means the board established by the American Academy of Actuaries to develop and promulgate standards of actuarial practice.

(b) "Contract premium" means the gross premium that is required to be paid under a fixed premium policy, including the premium for a rider for which benefits are shown in the illustration.

(c) "Currently payable scale" means a scale of nonguaranteed elements in effect for a policy form as of the preparation date of the illustration or declared to become effective within the next 95 days.

(d) "Disciplined current scale" means a scale of nonguaranteed elements constituting a limit on illustrations currently being illustrated by an insurer that is reasonably based on actual recent historical experience, as certified annually by an illustration actuary designated by the insurer. Further guidance in determining the disciplined current scale as contained in standards established by the Actuarial Standards Board may be relied upon if the standards meet all of the following:

(1) Have not been found to be inconsistent with the provisions of this chapter by the commissioner after a hearing held in accordance with Sections 11500 to 11530, inclusive, of the Government Code.

(2) Limit a disciplined current scale to reflect only actions that have already been taken or events that have already occurred.

(3) Do not permit a disciplined current scale to include any projected trends of improvements in experience or any assumed improvements in experience beyond the illustration date.

(4) Do not permit assumed expenses to be less than minimum assumed expenses.

(e) "Generic name" means a short title descriptive of the policy being illustrated such as whole life, "term life" or "flexible premium adjustable life."

(f) "Guaranteed elements" means the premiums, benefits, values, credits or charges under a policy of life insurance that are guaranteed and determined at issue.

(g) "Illustrated scale" means a scale of nonguaranteed elements currently being illustrated that is not more favorable to the policy owner than the lesser of either of the following:

(1) The disciplined current scale.

(2) The currently payable scale.

(h) "Illustration" means a presentation or depiction that includes nonguaranteed elements of a policy of life insurance over a period of years and that is one of the three types defined below:

(1) "Basic illustration" means a ledger or proposal used in the sale of a life insurance policy that shows both guaranteed and nonguaranteed elements.

(2) "Supplemental illustration" means an illustration furnished in addition to a basic illustration that meets the applicable requirements of this regulation, and that may be presented in a format differing from the basic illustration, but may only depict a scale of nonguaranteed elements that is permitted in a basic illustration.

(3) "In force illustration" means an illustration furnished at any time after the policy that it depicts has been in force for one year or more.

(i) "Illustration actuary" means an actuary meeting the requirements of Section 10509.960 who certifies to illustrations based on the standard of practice promulgated by the Actuarial Standards Board.

(j) "Lapse-supported illustration" means an illustration of a policy form failing the test of self-supporting as defined in this chapter, under a modified persistency rate assumption using persistency rates underlying the disciplined current scale for the first five years and 100 percent policy persistency thereafter.

(k) "Life insurance" means insurance upon the lives of persons or appertaining thereto.

(*l*)(1) "Minimum assumed expenses" means the minimum expenses that may be used in the calculation of the disciplined current scale for a policy form. The insurer may choose to designate each year the method of determining assumed expenses for all policy forms from all of the following:

(A) Fully allocated expenses.

(B) Marginal expenses.

(C) A generally recognized expense table based on fully allocated expenses representing a significant portion of insurance companies and approved by the commissioner.

(2) Marginal expenses may be used only if greater than a generally recognized expense table. If no generally recognized expense table is approved, fully allocated expenses must be used.

(m) "Non-guaranteed elements" means the premiums, benefits, values, credits or charges under a policy of life insurance that are not guaranteed or not determined at issue.

(n) "Non-term group life" means a group policy or individual policies of life insurance issued to members of an employer group or other permitted group that includes all of the following:

(1) Every plan of coverage was selected by the employer or other group representative.

(2) Some portion of the premium is paid by the group or through payroll deduction.

(3) Group underwriting or simplified underwriting is used.

(o) "Policy owner" means the owner named in the policy or the certificate holder in the case of a group policy.

(p) "Premium outlay" means the amount of premium assumed to be paid by the policy owner or other premium payer out-of-pocket.

(q) "Self-supporting illustration" means an illustration of a policy form for which it can be demonstrated that, when using experience assumptions underlying the disciplined current scale, for all illustrated points in time on or after the 15th policy anniversary or the 20th policy anniversary for second-or-later-to-die policies (or upon policy expiration if sooner), the accumulated value of all policy cash-flows equals or exceeds the total policy owner value available. For this purpose, policy owner value will include cash surrender values and any other illustrated benefit amounts available at the policy owner's election.

## Cal. Ins. Code §10509.954

(a) Each insurer marketing policies to which this chapter is applicable shall notify the commissioner whether a policy form is to be marketed with or without an illustration. For all policy forms being actively marketed on the effective date of this chapter, the insurer shall identify in writing those forms and whether or not an illustration will be used with them. For policy forms filed after the effective date of this chapter, the identification shall be made at the time of filing. Any previous identification may be changed by notice to the commissioner.

(b) If the insurer identifies a policy form as one to be marketed without an illustration, any use of an illustration for any policy using that form prior to the first policy anniversary is prohibited.

(c) If a policy form is identified by the insurer as one to be marketed with an illustration, a basic illustration prepared and delivered in accordance with this chapter is required, except that a basic illustration need not be provided to individual members of a group or to individuals insured under multiple lives coverage issued to a single applicant unless the coverage is marketed to these individuals. The illustration furnished an applicant for a group life insurance policy or policies issued to a single applicant on multiple lives may be either an individual or composite illustration representative of the coverage on the lives of members of the group or the multiple lives covered.

(d) Potential enrollees of nonterm group life subject to this chapter shall be furnished a quotation with the enrollment materials. The quotation shall show potential policy values for sample ages and policy years on a guaranteed and nonguaranteed basis appropriate to the group and the coverage. This quotation shall not be considered an illustration for purposes of this chapter, but all information provided shall be consistent with the illustrated scale. A basic illustration shall be provided at delivery of the certificate to enrollees for nonterm

group life who enroll for more than the minimum premium necessary to provide pure death benefit protection. In addition, the insurer shall make a basic illustration available to any nonterm group life enrollee who requests it.

**Cal. Ins. Code §10509.955**

(a) An illustration used in the sale of a life insurance policy shall satisfy the applicable requirements of this chapter, be clearly labeled "life insurance illustration," and include, but not be limited to, the following information:

(1) Name of insurer.

(2) Name and business address of producer or insurer's authorized representative, if any.

(3) Name, age and sex of proposed insured, except where a composite illustration is permitted under this chapter.

(4) Underwriting or rating classification upon which the illustration is based.

(5) Generic name of the policy, the company product name, if different, and form number.

(6) Initial death benefit.

(7) Dividend option election or application of nonguaranteed elements, if applicable.

(b) When using an illustration in the sale of a life insurance policy, an insurer or its producers or other authorized representatives shall not do any of the following:

(1) Represent the policy as anything other than a life insurance policy.

(2) Use or describe nonguaranteed elements in a manner that is misleading or has the capacity or tendency to mislead.

(3) State or imply that the payment or amount of nonguaranteed elements is guaranteed.

(4) Use an illustration that does not comply with the requirements of this chapter.

(5) Use an illustration that at any policy duration depicts policy performance more favorable to the policy owner than that produced by the illustrated scale of the insurer whose policy is being illustrated.

(6) Provide an applicant with an incomplete illustration.

(7) Represent in any way that premium payments will not be required for each year of the policy in order to maintain the illustrated death benefits, unless that is the fact.

(8) Use the term "vanishing" or "vanishing premium," or a similar term that implies the policy becomes paid up, to describe a plan for using nonguaranteed elements to pay a portion of future premiums.

(9) Except for policies that can never develop nonforfeiture values, use an illustration that is "lapse-supported."

(10) Use an illustration that is not "self-supporting."

(c) If an interest rate used to determine the illustrated nonguaranteed elements is shown, it shall not be greater than the earned interest rate underlying the disciplined current scale.

## Cal. Ins. Code §10509.956

(a) A basic illustration shall conform with the following requirements:

(1) The illustration shall be labeled with the date on which it was prepared.

(2) Each page, including any explanatory notes or pages, shall be numbered and show its relationship to the total number of pages in the illustration.

(3) The assumed dates of payment receipt and benefit payout within a policy year shall be clearly identified.

(4) If the age of the proposed insured is shown as a component of the tabular detail, it shall be issue age plus the numbers of years the policy is assumed to have been in force.

(5) The assumed payments on which the illustrated benefits and values are based shall be identified as premium outlay or contract premium, as applicable. For

policies that do not require a specific contract premium, the illustrated payments shall be identified as premiums outlay.

(6) Guaranteed death benefits and values available upon surrender, if any, for the illustrated premium outlay or contract premium shall be shown and clearly labeled guaranteed.

(7) If the illustration shows any nonguaranteed elements, they cannot be based on a scale more favorable to the policy owner than the insurer's illustrated scale at any duration. These elements shall be clearly labeled nonguaranteed.

(8) The guaranteed elements, if any, shall be shown before corresponding nonguaranteed elements and shall be specifically referred to on any page of an illustration that shows or describes only the nonguaranteed elements.

(9) The account or accumulation value of a policy, if shown, shall be identified by the name this value is given in the policy being illustrated and shown in close proximity to the corresponding value available upon surrender.

(10) The value available upon surrender shall be identified by the name this value is given in the policy being illustrated and shall be the amount available to the policy owner in a lump sum after deduction of surrender charges, policy loans, and policy loan interest, as applicable.

(11) Illustrations may show policy benefits and values in graphic or chart form in addition to the tabular form.

(12) Any illustration of nonguaranteed elements shall be accompanied by a statement indicating that:

(A) The benefits and values are not guaranteed.

(B) The assumptions on which they are based are subject to change by the insurer.

(C) Actual results may be more or less favorable.

(13) If the illustration shows that the premium payer may have the option to allow policy charges to be paid using nonguaranteed values, the illustration shall clearly disclose that a charge continues to be required and that, depending on actual results, the premium payer may need to continue or resume premium outlays. Similar disclosure shall be made for premium outlay of lesser amounts or shorter

durations than the contract premium. If a contract premium is due, the premium outlay display shall not be left blank or show zero unless accompanied by an asterisk or similar mark to draw attention to the fact that the policy is not paid up.

(14) If the applicant plans to use dividends or policy values, guaranteed or nonguaranteed, to pay all or a portion of the contract premium or policy charges, or for any other purpose, the illustration may reflect those plans and the impact on future policy benefits and values.

(b) A basic illustration shall include all of the following:

(1) A brief description of the policy being illustrated, including a statement that it is a life insurance policy.

(2) A brief description of the premium outlay or contract premium, as applicable, for the policy. For a policy that does not require payment of a specific contract premium, the illustration shall show the premium outlay that must be paid to guarantee coverage for the term of the contract, subject to maximum premiums allowable to qualify as a life insurance policy under the applicable provisions of the Internal Revenue Code.

(3) A brief description of any policy features, riders or options, guaranteed or nonguaranteed, shown in the basic illustration and the impact they may have on the benefits and values of the policy.

(4) Identification and a brief definition of column headings and key terms used in the illustration.

(5) A statement as follows: "This illustration assumes that the currently illustrated nonguaranteed elements will continue unchanged for all years shown. This is not likely to occur, and actual results may be more or less favorable than those shown."

(c)(1) Following the narrative summary, a basic illustration shall include a numeric summary of the death benefits and values and the premium outlay and contract premium, as applicable. For a policy that provides for a contract premium, the guaranteed death benefits and values shall be based on the contract premium. This summary shall be shown for at least policy years 5, 10, and 20 and at age 70, if applicable, on the three bases shown below. For multiple life policies the summary shall show policy years 5, 10, 20, and 30.

(A) Policy guarantees.

(B) Insurer's illustrated scale.

(C) Insurer's illustrated scale used but with the nonguaranteed elements reduced as follows:

(i) Dividends at 50 percent of the dividends contained in the illustrated scale used.

(ii) Nonguaranteed credited interest at rates that are the average of the guaranteed rates and the rates contained in the illustrated scale used.

(iii) All nonguaranteed charges, including but not limited to, term insurance charges, mortality and expense charges, at rates that are the average of the guaranteed rates and the rates contained in the illustrated scale used.

(2) In addition, if coverage would cease prior to policy maturity or age 100, the year in which coverage ceases shall be identified for each of the three bases.

(d) Statements substantially similar to the following shall be included on the same page as the numeric summary and signed by the applicant, or the policy owner in the case of an illustration provided at time of delivery, as required in this chapter.

(1) A statement to be signed and dated by the applicant or policy owner reading as follows: "I have received a copy of this illustration and understand that any nonguaranteed elements illustrated are subject to change and could be either higher or lower. The agent has told me they are not guaranteed."

(2) A statement to be signed and dated by the insurance producer or other authorized representative of the insurer reading as follows: "I certify that this illustration has been presented to the applicant and that I have explained that any nonguaranteed elements illustrated are subject to change. I have made no statements that are inconsistent with the illustration."

(e)(1) A basic illustration shall include the following information for at least each policy year from 1 to 10 and for every fifth policy year thereafter ending at age 100, policy maturity or final expiration; and except for term insurance beyond the 20th year, for any year in which the premium outlay and contract premium, if applicable, is to change:

(A) The premium outlay and mode the applicant plans to pay and the contract premium, as applicable.

(B) The corresponding guaranteed death benefit, as provided in the policy.

(C) The corresponding guaranteed value available upon surrender, as provided in the policy.

(2) For a policy that provides for a contract premium, the guaranteed death benefit and value available upon surrender shall correspond to the contract premium.

(3) Nonguaranteed elements may be shown if described in the contract. In the case of an illustration for a policy on which the insurer intends to credit terminal dividends, they may be shown if the insurer's current practice is to pay terminal dividends. If any nonguaranteed elements are shown they must be shown at the same durations as the corresponding guaranteed elements, if any. If no guaranteed benefit or value is available at any duration for which a nonguaranteed benefit or value is shown, a zero shall be displayed in the guaranteed column.

**Cal. Ins. Code §10509.957**

(a) A supplemental illustration may be provided if it meets all of the following requirements:

(1) It is appended to, accompanied by, or preceded by a basic illustration that complies with this chapter.

(2) The nonguaranteed elements shown are not more favorable to the policy owner than the corresponding elements based on the scale used in the basic illustration.

(3) It contains the same statement as required of a basic illustration under subdivision (d) of Section 10509.956 that nonguaranteed elements are not guaranteed.

(4) For a policy that has a contract premium, the contract premium underlying the supplemental illustration is equal to the contract premium shown in the basic illustration. For policies that do not require a contract premium, the premium outlay underlying the supplemental illustration shall be equal to the premium outlay shown in the basic illustration.

(b) The supplemental illustration shall include a notice referring to the basic illustration for guaranteed elements and other important information.

(c) If cost indices are required by Chapter 5.6 (commencing with Section 10509.970), they may be provided by means of a supplemental illustration or included in the basic illustration. Those indices shall be based on nonguaranteed elements calculated according to the standards required in this chapter.

## Cal. Ins. Code §10509.958

(a)(1) If a basic illustration is used by an insurance producer or other authorized representative of the insurer in the sale of a life insurance policy and the policy is applied for as illustrated, a copy of that illustration, signed in accordance with this chapter, shall be submitted to the insurer at the time of the policy application. A copy also shall be provided to the applicant.

(2) If the policy is issued other than as applied for, a revised basic illustration conforming to the policy as issued shall be sent with the policy. The revised illustration shall conform to the requirements of this chapter, shall be labeled "Revised Illustration" and shall be signed and dated by the applicant or policy owner and producer or other authorized representative of the insurer no later than the time the policy is delivered. A copy shall be provided to the insurer and the policy owner.

(b)(1) If no illustration is used by an insurance producer or other authorized representative in the sale of a life insurance policy or if the policy is applied for other than as illustrated, the producer or representative shall certify to that effect in writing on a form provided by the insurer. On the same form the applicant shall acknowledge that no illustration conforming to the policy applied for was provided and shall further acknowledge an understanding that an illustration conforming to the policy as issued will be provided no later than at the time of policy delivery. This form shall be submitted to the insurer at the time of policy application.

(2) If the policy is issued, a basic illustration conforming to the policy as issued shall be sent with the policy and signed by the policy owner no later than the time the policy is delivered. A copy shall be provided to the insurer and the policy owner.

(c) If the basic illustration or revised illustration is sent by the insurer to the applicant or policy owner by mail, it shall include instructions for the applicant or policy owner to sign the duplicate copy of the numeric summary page of the

illustration for the policy issued and return the signed copy to the insurer. The insurer's obligation under this subdivision shall be satisfied if it can demonstrate that it has made a diligent effort to secure a signed copy of the numeric summary page. The requirement to make a diligent effort shall be deemed satisfied if the insurer includes in the mailing a self-addressed postage prepaid envelope with instructions for the return of the signed numeric summary page.

(d) A copy of the basic illustration and a revised basic illustration, if any, signed as applicable, along with any certification that either no illustration was used or that the policy was applied for other than as illustrated, shall be retained by the insurer until three years after the policy is no longer in force. A copy need not be retained if no policy is issued.

**Cal. Ins. Code §10509.959**

(a) In the case of a policy designated as one for which illustrations will be used, the insurer shall provide each policy owner with an annual report on the status of the policy that shall include, but not be limited to, the following information:

(1) For universal life policies, the report shall include the following:

(A) The beginning and end date of the current report period.

(B) The policy value at the end of the previous report period and at the end of the current report period.

(C) The total amounts that have been credited or debited to the policy value during the current report period, identifying each by type, including, but not limited to, interest, mortality, expense and riders.

(D) The current death benefit at the end of the current report period on each life covered by the policy.

(E) The net cash surrender value of the policy as of the end of the current report period.

(F) The amount of outstanding loans, if any, as of the end of the current report period.

(G) For fixed premium policies:

If, assuming guaranteed interest, mortality and expense loads and continued scheduled premium payments, the policy's net cash surrender value is such that it would not maintain insurance in force until the end of the next reporting period, a notice to this effect shall be included in the report.

(H) For flexible premium policies:

If, assuming guaranteed interest, mortality and expense loads, the policy's net cash surrender value will not maintain insurance in force until the end of the next reporting period unless further premium payments are made, a notice to this effect shall be included in the report.

(2) For all other policies, the report shall include the following, where applicable:

(A) Current death benefit.

(B) Annual contract premium.

(C) Current cash surrender value.

(D) Current dividend.

(E) Application of current dividend.

(F) Amount of outstanding loan.

(3) Insurers writing life insurance policies that do not build nonforfeiture values shall only be required to provide an annual report with respect to these policies for those years when a change has been made to nonguaranteed policy elements by the insurer.

(b) If the annual report does not include an in force illustration, it shall contain the following notice displayed prominently: "IMPORTANT POLICY OWNER NOTICE: You should consider requesting more detailed information about your policy to understand how it may perform in the future. You should not consider replacement of your policy or make changes in your coverage without requesting a current illustration. You may annually request, without charge, such an illustration by calling [insurer's phone number], writing to [insurer's address] or contacting your agent. If you do not receive a current illustration of your policy within thirty days from your request, you should contact your state insurance department." The

insurer may vary the sequential order of the methods for obtaining an in force illustration.

(c) Upon the request of the policy owner, the insurer shall furnish an in force illustration of current and future benefits and values based on the insurer's present illustrated scale. This illustration shall comply with the requirements of subdivisions (a) and (b) of Section 10509.955 and subdivisions (a) and (e) of Section 10509.956. No signature or other acknowledgment of receipt of this illustration shall be required.

(d) If an adverse change in nonguaranteed elements that could affect the policy has been made by the insurer since the last annual report, the annual report shall contain a notice of that fact and the nature of the change prominently displayed.

## Cal. Ins. Code §10509.960

(a) The board of directors of each insurer shall appoint one or more illustration actuaries.

(b) The illustration actuary shall certify that the disciplined current scale used in illustrations is in conformity with the Actuarial Standard of Practice for Compliance with the NAIC Model Regulation on Life Insurance Illustrations promulgated by the Actuarial Standards Board, and that the illustrated scales used in insurer-authorized illustrations meet the requirements of this chapter.

(c) The illustration actuary shall comply with all of the following:

(1) Be a member in good standing of the American Academy of Actuaries.

(2) Be familiar with the standard of practice regarding life insurance policy illustrations.

(3) Not been found by the commissioner, following appropriate notice and hearing, to have engaged in or committed any of the following acts:

(A) Violated any provision of, or any obligation imposed by, the insurance law or other law in the course of his or her dealings as an illustration actuary.

(B) Been found guilty of fraudulent or dishonest practices.

(C) Demonstrated his or her incompetence, lack of cooperation, or untrustworthiness to act as an illustration actuary.

(D) Resigned or been removed as an illustration actuary within the past five years as a result of acts or omissions indicated in any adverse report on examination or as a result of a failure to adhere to generally acceptable actuarial standards.

(4) Notify the commissioner of any acts engaged in or committed in another state that are similar to those described in paragraph (3).

(5) Disclose in the annual certification whether, since the last certification, a currently payable scale applicable for business issued within the previous five years and within the scope of the certification has been reduced for reasons other than changes in the experience factors underlying the disciplined current scale. Nonguaranteed elements illustrated for new policies that are not consistent with those illustrated for similar in force policies shall be disclosed in the annual certification. Nonguaranteed elements illustrated for both new and in force policies that are not consistent with the nonguaranteed elements actually being paid, charged or credited to the same or similar forms shall be disclosed in the annual certification.

(6) Disclose in the annual certification the method used to allocate overhead expenses for all illustrations including:

(A) Fully allocated expenses.

(B) Marginal expenses.

(C) A generally recognized expense table based on fully allocated expenses representing a significant portion of insurance companies and approved by the commissioner.

(d)(1) The illustration actuary shall file a certification with the board of directors of the insurer and with the commissioner as follows:

(A) Annually for all policy forms for which illustrations are used.

(B) Before a new policy form is illustrated.

(2) If an error in a previous certification is discovered, the illustration actuary shall notify the board of directors of the insurer and the commissioner promptly.

(e) If an illustration actuary is unable to certify the scale for any policy form illustration the insurer intends to use, the actuary shall notify the board of directors of the insurer and the commissioner promptly of his or her inability to certify.

(f) A responsible officer of the insurer, other than the illustration actuary, shall certify annually the following:

(1) The illustration formats meet the requirements of this chapter and the scales used in insurer-authorized illustrations are those scales certified by the illustration actuary.

(2) The company provided its agents with information about the expense allocation method used by the company in its illustrations and complied with the disclosure requirements of paragraph (6) of subdivision (c).

(g) The annual certifications shall be provided to the commissioner each year by a date determined by the insurer.

(h) If an insurer changes the illustration actuary responsible for all or a portion of the company's policy forms, the insurer shall notify the commissioner of that fact promptly and disclose the reason for the change.

## Cal. Ins. Code §10509.961

In addition to any other penalties provided by law, an insurer or producer that violates any provision of this chapter shall be subject to Section 790.06.

## Cal. Ins. Code §10509.962

The provisions of this chapter are severable. If any provision of this chapter or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

## Cal. Ins. Code §10509.963

If the commissioner has reason to believe that any insurer has violated this chapter, the commissioner may request and the insurer shall file both of the following:

(a) An example of the annual report to the policy owner with notice of adverse change in nonguaranteed elements.

(b) An example of an illustration.

**Cal. Ins. Code §10509.964**

Review by the commissioner of illustrations, supporting materials, certifications, and any and all other materials prepared pursuant to this chapter shall be subject to Section 736.

**Cal. Ins. Code §10509.965**

This chapter shall become effective on and after July 1, 1997, and shall apply to policies sold on or after that date.

**Cal. Ins. Code §10127.9**

(a) Every policy of individual life insurance which is initially delivered or issued for delivery in this state on and after January 1, 1990, shall have printed thereon or attached thereto a notice stating that, after receipt of the policy by the owner, the policy may be returned by the owner for cancellation by delivering it or mailing it to the insurer or to the agent through whom it was purchased. The period of time set forth by the insurer for return of the policy by the insured shall be clearly stated on the notice and this period shall be not less than 10 days nor more than 30 days. The insured may return the policy to the insurer by mail or otherwise at any time during the period specified in the notice. In the case of individual life insurance policies (other than variable contracts and modified guaranteed contracts), by delivering or mailing the policy pursuant to this section during the cancellation period, the owner shall void the policy from the beginning, and the parties shall be in the same position as if no policy had been issued. All premiums paid and any policy fee paid for the policy shall be refunded by the insurer to the owner within 30 days from the date that the insurer is notified that the insured has canceled the policy. In the case of variable annuity contracts, variable life insurance contracts, and modified guaranteed contracts, return of the contract during the cancellation period shall entitle the owner to a refund of account value and any policy fee paid for the policy. The account value and policy fee shall be refunded by the insurer to the owner within 30 days from the date that the insurer is notified that the owner has canceled the policy.

(b) This section applies to all policies issued or delivered in this state on or after January 1, 1990, but does not apply to any policy subject to Section 10127.7. All policies subject to this section which are in effect on January 1, 1990, shall be

construed to be in compliance with this section, and any provision in any policy which is in conflict with this section shall be of no force or effect.

(c) This section does not apply to individual life insurance policies issued in connection with a credit transaction or issued under a contractual policy-change or conversion privilege provision contained in a policy.

## **Other Authorities**

**Federal Rule of Appellate Procedure 5:**

**RULE 5. Appeal by Permission**

**(a) Petition for Permission to Appeal.**

(1) To request permission to appeal when an appeal is within the court of appeals' discretion, a party must file a petition for permission to appeal. The petition must be filed with the circuit clerk with proof of service on all other parties to the district-court action.

(2) The petition must be filed within the time specified by the statute or rule authorizing the appeal or, if no such time is specified, within the time provided by Rule 4(a) for filing a notice of appeal.

(3) If a party cannot petition for appeal unless the district court first enters an order granting permission to do so or stating that the necessary conditions are met, the district court may amend its order, either on its own or in response to a party's motion, to include the required permission or statement. In that event, the time to petition runs from entry of the amended order.

**(b) Contents of the Petition; Answer or Cross-Petition; Oral Argument.**

(1) The petition must include the following:

(A) the facts necessary to understand the question presented;

(B) the question itself;

(C) the relief sought;

(D) the reasons why the appeal should be allowed and is authorized by a statute or rule; and

(E) an attached copy of:

(i) the order, decree, or judgment complained of and any related opinion or memorandum, and

(ii) any order stating the district court's permission to appeal or finding that the necessary conditions are met.

(2) A party may file an answer in opposition or a cross-petition within 10 days after the petition is served.

(3) The petition and answer will be submitted without oral argument unless the court of appeals orders otherwise.

**(c) Form of Papers; Number of Copies; Length Limits.** All papers must conform to Rule 32(c)(2). An original and 3 copies must be filed unless the court requires a different number by local rule or by order in a particular case. Except by the court's permission, and excluding the accompanying documents required by Rule 5(b)(1)(E):

(1) a paper produced using a computer must not exceed 5,200 words; and

(2) a handwritten or typewritten paper must not exceed 20 pages.

**(d) Grant of Permission; Fees; Cost Bond; Filing the Record.**

(1) Within 14 days after the entry of the order granting permission to appeal, the appellant must:

(A) pay the district clerk all required fees; and

(B) file a cost bond if required under Rule 7.

(2) A notice of appeal need not be filed. The date when the order granting permission to appeal is entered serves as the date of the notice of appeal for calculating time under these rules.

(3) The district clerk must notify the circuit clerk once the petitioner has paid the fees. Upon receiving this notice, the circuit clerk must enter the appeal on the docket. The record must be forwarded and filed in accordance with Rules 11 and 12(c).

**Federal Rule of Civil Procedure 23:**

**Rule 23 – Class Actions**

(a) **Prerequisites**. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Types of Class Actions**. A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

(c) **Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses**.

(1) *Certification Order*.

(A) Time to Issue. At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

(B) Defining the Class; Appointing Class Counsel. An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

(C) Altering or Amending the Order. An order that grants or denies class certification may be altered or amended before final judgment.

(2) *Notice*.

(A) For (b)(1) or (b)(2) Classes. For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class.

(B) For (b)(3) Classes. For any class certified under Rule 23(b)(3)—or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)—the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all

members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means.The notice must clearly and concisely state in plain, easily understood language:

(i) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

(3) *Judgment*. Whether or not favorable to the class, the judgment in a class action must:

(A) for any class certified under Rule 23(b)(1) or (b)(2), include and describe those whom the court finds to be class members; and

(B) for any class certified under Rule 23(b)(3), include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members.

(4) *Particular Issues*. When appropriate, an action may be brought or maintained as a class action with respect to particular issues.

(5) *Subclasses*. When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.

(d) **Conducting the Action**.

(1) *In General*. In conducting an action under this rule, the court may issue orders that:

(A) determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

(B) require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of:

(i) any step in the action;

(ii) the proposed extent of the judgment; or

(iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

(C) impose conditions on the representative parties or on intervenors;

(D) require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

(E) deal with similar procedural matters.

(2) *Combining and Amending Orders*. An order under Rule 23(d)(1) may be altered or amended from time to time and may be combined with an order under Rule 16.

(e) **Settlement, Voluntary Dismissal, or Compromise**. The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1) *Notice to the Class*.

(A) Information That Parties Must Provide to the Court. The parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class.

(B) Grounds for a Decision to Give Notice. The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to:

(i) approve the proposal under Rule 23(e)(2); and

(ii) certify the class for purposes of judgment on the proposal.

(2) *Approval of the Proposal*. If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

(3) *Identifying Agreements*. The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) *New Opportunity to Be Excluded*. If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5) *Class-Member Objections*.

(A) In General. Any class member may object to the proposal if it requires court approval under this subdivision (e). The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection.

(B) Court Approval Required for Payment in Connection with an Objection. Unless approved by the court after a hearing, no payment or other consideration may be provided in connection with:

(i) forgoing or withdrawing an objection, or

(ii) forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal.

(C) Procedure for Approval After an Appeal. If approval under Rule 23(e)(5)(B) has not been obtained before an appeal is docketed in the court of appeals, the procedure of Rule 62.1 applies while the appeal remains pending.

(f) **Appeals**. A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule, but not from an order under Rule 23(e)(1). A party must file a petition for permission to appeal with the circuit clerk within 14 days after the order is entered or within 45 days after the order is entered if any party is the United States, a United States agency, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

(g) **Class Counsel**.

(1) *Appointing Class Counsel*. Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

(A) must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class;

(B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

A-31

(C) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

(D) may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and

(E) may make further orders in connection with the appointment.

(2) *Standard for Appointing Class Counsel*. When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4). If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.

(3) *Interim Counsel*. The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.

(4) *Duty of Class Counsel*. Class counsel must fairly and adequately represent the interests of the class.

(h) **Attorney's Fees and Nontaxable Costs**. In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

(1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2) A class member, or a party from whom payment is sought, may object to the motion.

(3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

(4) The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

**Central District of California Local Rule 7-3**

**L.R. 7-3 Conference of Counsel Prior to Filing of Motions.**  In all cases not listed exempt in L.R. 16-12, and except in connection with discovery motions (which are governed by L.R. 37-1 through 37-4) and applications for temporary restraining orders or preliminary injunctions, counsel contemplating the filing of any motion shall first contact opposing counsel to discuss thoroughly, preferably in person, the substance of the contemplated motion and potential resolution.  The conference shall take place at least seven (7) days prior to the filing of the motion. If the parties are unable to reach a resolution which eliminates the necessity for a hearing, counsel for the moving party shall include in the notice of motion a statement to the folloing effect:

"This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on (date)."

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2019, I electronically filed the foregoing Second Brief on Cross-Appeal with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Brian P. Brosnahan
Brian P. Brosnahan